## TERRITORY *v.* DAVID C. BUICK.

## No. 1388.

EXCEPTIONS FROM CIRCUIT COURT FIRST CIRCUIT.
HON. J. J. BANKS, JUDGE.

ARGUED FEBRUARY 7, 1923.              DECIDED APRIL 10, 1923.

PETERS, C. J., PERRY AND LINDSAY, JJ.

CRIMINAL LAW—*trial—instructions—degree of crime.*

When the evidence in a case in which the defendant is charged
with murder in the first degree is such as not to support a verdict
of manslaughter or of assault and battery, it is not error for
the presiding judge in his charge to the jury to omit all ref-
erence to manslaughter and to assault and battery and to direct
the jury that its verdict will be either that the defendant is
guilty of murder in the first degree or that he is guilty of mur-
der in the second degree or that he is not guilty.

SAME.

The evidence in this case reviewed and held not to permit a
finding of guilty of manslaughter or of assault and battery.

SAME—*definition of "reasonable doubt."*

An instruction that the real question submitted to a jury under
an indictment for murder in the first degree is "whether after
hearing the evidence and from the evidence you have or not an
abiding belief that defendant is guilty and if you have such
belief so formed it is your duty to convict" whether regarded by
itself or in conjunction with other instructions amply directing
the jury that it cannot convict unless the evidence for the
prosecution shows that the defendant is guilty beyond a reason-
able doubt and further explaining to the jury that a reasonable
doubt "is a doubt of guilt reasonably arising from all the evi-
dence in the case," that "proof is said to be deemed to be beyond
all reasonable doubt when the evidence is sufficient to impress
the judgment of ordinarily prudent men with a conviction on
which they would act without hesitation in their own most im-
portant concerns and affairs of life," that the circumstances dis-
closed by the evidence "must exclude to a moral certainty every
other reasonable hypothesis" than the innocence of the defendant

Syllabus.

and otherwise correctly indicating the meaning of the term reasonable doubt as used in criminal law, is not erroneous.

SAME—*credibility of witnesses.*

An instruction in a trial under an indictment for murder that "if you find and believe from the evidence that any witness in this case has knowingly and wilfully sworn falsely to any material fact in this trial or that any witness has knowingly and wilfully exaggerated any material fact or circumstance for the purpose of deceiving, misleading or imposing upon you, then you have a right to reject the testimony of such witness, unless corroborated by other credible evidence" held correct, particularly in the light of other instructions.

EVIDENCE—*opinions of non-expert witnesses.*

Non-expert witnesses may give their opinions, in connection with the facts upon which they are founded, when the matter to which the testimony relates cannot otherwise be reproduced or made palpable to the jurors.

SAME—*resemblance of persons.*

It is competent for a witness who arrives upon the scene of a murder almost immediately after the shooting and sees a man running away from the prostrate form of the decedent, after describing the apparel worn by the escaped person, to testify that in his opinion "he was a pretty well built man, pretty near like him, something like him" (meaning the accused on trial).

WITNESSES—*credibility and impeachment—cross-examination concerning specific offenses.*

A witness may be asked on cross-examination as to specific acts and matters showing his general moral character in so far as this may affect his credibility. He may be asked whether at the time to which his testimony in chief relates he was living in adultery with a woman named,—subject always to the witness' privilege to refuse to answer.

EVIDENCE—*confessions by silence when accused.*

In a trial under indictment charging murder in the first degree, testimony that another person said, in the presence and hearing of the defendant, that the decedent who was then lying on a bed in a hospital a few feet away said that he was certain that defendant was the man who shot him, followed by testimony to the effect that the defendant remained silent in the face of this accusation, is admissible as tending to show a confession or acquiescence by silence, even though at the time of the making of the accusation defendant's attorney was present.

SAME—*dying declarations—when admissible.*

A narrative by the wounded person of the history of the shooting in which he identifies the accused as his assailant and gives other details of the crime is admissible as a dying declaration when made in extremity and at the point of death and with a realization on the part of the speaker that death is imminent.

CRIMINAL LAW—*trial—instructions—presumption of malice in homicide.*

An instruction in the language of the statute to the effect that, when the act of killing another is proved, malice aforethought shall be presumed against the party who did the killing even though unauthorized by law (on the theory that the statute authorizing it is unconstitutional) is not prejudicial to the defendant in a case where the evidence does not in any view permit of a finding that the killing was without malice aforethought and requires a finding either that the defendant did not commit the killing or else that he committed the killing with malice aforethought.

SAME—*argument and conduct of counsel—time of objections.*

An objection to an argument by counsel for the Territory to a jury in the trial of a criminal case comes too late when made for the first time after rendition of the verdict.

## OPINION OF THE COURT BY PERRY, J.

The appellant was convicted by a jury of the crime of murder in the second degree and was sentenced to imprisonment at hard labor for a term of not less than twenty years nor more than thirty years. The case comes to this court on exceptions, the more important of which will be here referred to in detail.

### I.

The following instruction was given by the trial judge: "I further instruct you that in this case you may bring in any one of the following verdicts as the facts and circumstances in evidence under these instructions may warrant: 1, Guilty of murder in the first degree as charged; 2, guilty of murder in the second degree; 3, not

guilty." Definitions of the offense of murder in the first degree and of the offense of murder in the second degree were also given. There was no definition of manslaughter or of assault and battery and no instruction to the effect that the jury might also consider whether or not the defendant was guilty of either of these two offenses. One exception is to the limitation thus imposed upon the jury to one of the three possible verdicts just stated and to the exclusion from the consideration of the jury of the guilt or innocence of the defendant of the offenses of manslaughter and assault and battery. No request was made on behalf of the defendant for any instruction relating to the subject of manslaughter or for any instruction relating to the subject of assault and battery; but we shall not consider the effect of this failure. It is contended by the prosecution that when the subject of the instructions to be given to the jury was under consideration by the court and counsel at the trial, defendant's counsel expressly objected to the giving of any instructions on the subject of manslaughter and that thereby the defendant waived all objection to the omission by the trial judge from his instructions of any reference to the subject of manslaughter; and there is on file a certificate by the trial judge tending to show the existence of the facts upon which this contention is based. This contention also we find it unnecessary to consider. We prefer to base our decision purely upon the merits of the instruction as given on the point under consideration.

The essence of the indictment was that on December 2, 1917, the defendant did, by shooting, kill and murder one Ito. There was no eye-witness, other than the deceased Ito, to the actual shooting; although there were three witnesses who arrived on the scene almost immediately after the shooting and gave testimony which will be hereafter referred to. The history of the actual shooting

and of the material circumstances immediately preceding the shooting is to be found solely in the dying declaration of the decedent Ito as he lay in bed in the Queen's Hospital in this city about a week after the shooting and at a time when, as the trial judge found, the decedent realized that he was about to die from the effects of his wounds. The story as thus told by Ito was substantially as follows: One of his occupations was that of chauffeur of a rent automobile and on the night of December 2, 1917, he was engaged in the pursuit of that business. At the corner of King and River streets in Honolulu he was asked by the defendant to take him to Waipahu. The decedent drove the machine out King street towards Waipahu. Arriving at the top of a hill known as Red Hill, the defendant told the decedent that he wished to answer a call of nature. The decedent thereupon slowed up his car and looked around. The first thing that he saw in so looking around was a revolver "poked in his face" accompanied by a demand from the defendant for the decedent's money. The decedent succeeded in slipping his purse out of his pocket to a part of the machine between the cushion he was seated on and the back of the seat. At the point of the revolver the defendant ordered decedent out of the car, searched the decedent's pocket and took a dollar that he found. At this point the decedent thought he saw an opportunity of getting away, ducked under the revolver and started to run down the road when one shot was fired at him, which missed. A second shot was fired which hit him.

Other evidence shows that the bullet entered in the back at about the level of the ninth thoracic vertebra and about two or two and one-half inches from the spine and made its exit in front on the right side of the body a short distance below the nipple. Two other witnesses testified that while driving in an automobile from Waia-

nae towards town on the night in question, they saw at Red Hill, between 11 and 12 o'clock, a man running away from a point at which a few seconds later they saw the prostrate form of a Japanese (decedent was a Japanese) who was groaning and asking for help and who said that he had been shot. A third witness arriving a very few moments later also saw the wounded Japanese and brought him to the emergency hospital. The two witnesses first above referred to as coming from Waianae described the clothing, cap and shoes which they said the man was wearing whom they saw running away and testified that in size and build that man resembled the defendant.

The defendant was found by a police officer at about 2:30 A. M. in the vicinity of the hospital at Fort Shafter, which is not very far from the top of Red Hill, and was brought to the police station where he was detained. The clothes and shoes which he was then wearing corresponded with the description given by the two witnesses. No cap was found on the defendant. Upon the defendant's clothes at the time of his arrest were certain burs and seeds of grasses which burs and grasses it was testified to grew at Moanalua in the vicinity of the place where the shooting occurred. Defendant's trousers below the coat were wet or humid at the time of his arrest and his shirt and coat were wet with perspiration. An expert on firearms testified, in answer to a hypothetical question, that such a wound as described in the question was in his opinion made by a metal-cased 32-calibre bullet and there was other evidence tending to show that shortly prior to the day of the shooting, the defendant possessed a 32-calibre automatic pistol and metal-cased bullets of 32 calibre. There was other evidence tending to show that for some time next preceding the day of the shooting the defendant was out of employment and

in such financial straits that he had asked for the loan of money with which to purchase a meal. There was other evidence intended to rebut or weaken the claim of the prosecution as to the size and nature of the bullet that caused the wound and as to the financial condition of the defendant shortly prior to the time of the shooting.

The defense was an alibi, in other words, an absolute denial that it was the defendant who did the shooting and a claim that at the time of the shooting the defendant was at a place other than that where the shooting occurred. Not a word of evidence was offered by the defendant tending to show that the manner and the circumstances of the shooting were other than those related by Ito in his dying declaration. The evidence on this latter point as given by Ito remains wholly uncontradicted. As between the defendant's story that it was not he who shot Ito and that at the time of the shooting he (the defendant) was at another place and the story of Ito that it was the defendant who did the shooting, the jury has unmistakably shown by its verdict that it believed Ito and did not believe the defendant. There was ample evidence to support this finding and the verdict as rendered. Every untrue alibi, and the jury has declared that the defendant's alibi was untrue, involves the danger of leaving the main case of the prosecution unattacked as to the details of the shooting. If the jury believed Ito's story at all—and it did believe it—no reason appears in the record for its having discarded any essential part of his narrative. Chimerical possibilities or doubts are not to be indulged in by juries even in criminal cases, and the possibilities and doubts to be given heed to or to be indulged in by juries must have a real foundation in the evidence or in the circumstances of the case. The story as told by Ito, if it showed any

offense at all, showed that the defendant enticed the de-
cedent to Red Hill, which is beyond the outskirts of the
city of Honolulu near ground used as golf links and for
pasturage purposes and near a sugar cane plantation,
in other words, a more or less deserted and lonely spot,
and that reaching the spot, the defendant upon an untrue
pretense caused the decedent to stop his machine and
then proceeded in an effort to rob him at the point of a
revolver; and that when the decedent, wishing to hold
on to life and safety, endeavored to escape, the defendant
shot him in the back as he was running away and when
there was no threat or possibility of threat from the de-
cedent to the defendant endangering defendant's life or
limb. The evidence of Ito, if it is to be believed at all—
and the jury believed it—shows a murder committed with
deliberate, premeditated malice aforethought. There was
no room upon that evidence or upon any evidence in the
case to make a finding that the killing was without malice
aforethought, which latter is the main characteristic of
manslaughter and serves to distinguish it from murder.
So also there was no evidence which would have justified
the jury in finding that the bullet wound inflicted by
the defendant was not the cause of the decedent's death,
although that death was delayed a number of months.
The testimony of the medical experts and all the other
evidence in the case required a finding that the bullet
wounds did cause the decedent's death. The doctors per-
forming the autopsy did find indications that at some
time in the past the decedent had had tuberculosis but
their evidence all was to the effect that the tubercular
area had been "walled off" and that it was not any longer
an active disease or agency. There was some evidence
also that somewhere in the vicinity of the abdomen there
were, a few days before the decedent's death, burns which
may have been made by a hot-water bag carelessly ap-

plied; but the only evidence relating to this was, most positively, that these burns were not the cause of death. There was evidence of bed-sores on the body of the decedent but there was no room for any theory on the evidence other than that these bed-sores were caused by the decedent's long confinement to his bed, which confinement was caused purely by the bullet wounds and their effects. It is also true that a few days before his death the decedent was moved from the Queen's Hospital to Leahi Home but there is no room upon the evidence for any reasonable theory that this moving was the cause of death. There is no evidence that it was the cause of death. The direct evidence is all to the contrary.

It may be that the judge presiding at the trial erred in permitting the jury to consider whether or not the offense was murder in the second degree and to find, as it did, that the offense committed was murder in the second degree. If he did, the error is one at which the defendant cannot possibly be aggrieved. It was an error, if at all, very greatly to his advantage, resulting, perhaps, in his escaping the death penalty.

## II.

In the course of an attempt at defining, in his instructions to the jury, the term reasonable doubt, the trial judge said: "The real question is whether after hearing the evidence and from the evidence you have or not an abiding belief that defendant is guilty and if you have such belief so formed it is your duty to convict." To this instruction an exception was noted. On behalf of the defendant it is urged that this definition was erroneous and that it left the jurors at liberty to convict the defendant even though they were not satisfied to the degree required by the law of the guilt of the accused. In *Republic* v. *Yamane,* 12 Haw. 189, 215, an instruction

was approved wherein the court said by way of summarizing its definition of a reasonable doubt, "if, after considering all the evidence, you can say that you have an abiding conviction of the truth of the charge, then you are satisfied beyond a reasonable doubt."

To determine the exact distinction in meaning between "an abiding belief" and "an abiding conviction" would require a resort to the refinements of lexicographers. Webster himself found it necessary to say, *inter alia*, in defining "belief" that it is a "conviction or feeling of the truth of some proposition" and in defining "conviction" that it is a "strong persuasion or belief." It would be unwarrantable to hold that the jurors in this case who were undoubtedly laymen—not philologists nor lexicographers—would understand an "abiding belief" to be something substantially different from an "abiding conviction."

Moreover, the instruction excepted to and now under consideration, *in haec verba*, was given in *Territory* v. *Robello*, 20 Haw. 7, and was approved by this court against an objection that it sought to "explain away the rule of reasonable doubt" and make that rule "a delusion and a snare." Upon the strength of these two Hawaiian precedents alone, the instruction excepted to even if it had stood by itself would have to be supported. But it did not stand by itself. In many differing forms the trial judge emphasized to the jury the reality of the presumption of innocence which attended the defendant throughout the trial and the necessity of the Territory's proving its case against him beyond a reasonable doubt; and in various forms defined a reasonable doubt. On the subject of the presumption of innocence the presiding judge said *inter alia*:

"In criminal cases the defendant enters upon his trial with the presumption of innocence in his favor and the

burden of proof is upon the state to establish his guilt and the evidence must be sufficient to establish in your judgment his guilt beyond all reasonable doubt. As long as you have a reasonable doubt of the defendant's guilt it is your duty to acquit him."

"In considering the evidence if you can reasonably account for any fact in this case upon a theory or hypothesis which will admit of the defendant's innocence, it is your duty under the law to do so and if you have a reasonable doubt of his guilt you should acquit him."

"If the testimony in this case in its weight and effect be such as two conclusions can be reasonably drawn from it, the one favoring the defendant's innocence and the other tending to establish his guilt, law, justice and humanity alike demand that the jury shall adopt the former and find the accused not guilty."

"The burden of proof is upon the Territory and to entitle it to a conviction of the defendant the Territory must prove every material element of the offense charged to your satisfaction beyond a reasonable doubt and to the satisfaction of each member of the jury."

"The prisoner at the bar is presumed to be innocent until he is proven to be guilty. He is not required to prove his innocence but may rest upon the presumption in his favor until it is overthrown by affirmative proof. The burden is therefore on the Territory to establish to your satisfaction, beyond any reasonable doubt, the guilt of the prisoner as to the crime charged in this indictment. If you entertain any reasonable doubt as to any fact or element necessary to constitute the prisoner's guilt it is your sworn duty to give him the benefit of that doubt and return a verdict of acquittal. And even where the evidence demonstrates the probability of guilt, yet if it does not establish it beyond a reasonable doubt you must acquit the prisoner."

"As to this defense" (of alibi) "you are instructed that it is not necessary for the defendant to prove an alibi to your satisfaction, beyond a reasonable doubt, nor by a preponderance of the testimony, but if, after a full and fair consideration of all the facts and circumstances in evidence, you entertain a reasonable doubt as to whether or not the defendant was present at the time and place of the commission of the offense charged in the indictment, if such offense has been committed by any one, it will be your duty to give the defendant the benefit of such doubt and acquit him."

"If after consideration of the whole case any juror should entertain a reasonable doubt of the guilt of the defendant it is the duty of such juror so entertaining such doubt not to vote for a verdict of guilty nor to be influenced in so voting for the single reason that a majority of the jury should be in favor of a verdict of guilty."

"Each juror must be satisfied beyond a reasonable doubt that the defendant is guilty as charged, before he can, under his oath, consent to a verdict of conviction. If any of the jurors, after having duly considered all the evidence, and after having consulted with his fellow-jurymen, entertains such reasonable doubt, it will be the duty of such juror not to consent to a verdict of guilty."

At different points in his charge the judge, by way of indicating to the jurors what a "reasonable doubt" meant, said:

"A reasonable doubt which entitles an accused person to an acquittal is a doubt of guilt reasonably arising from all the evidence in the case. Proof is said to be deemed to be beyond all reasonable doubt when the evidence is sufficient to impress the judgment of ordinarily prudent men with a conviction on which they would act without hesitation in their own most important concerns

and affairs of life and if you have any such reasonable doubt you must give him the benefit thereof and acquit him."

"If you believe that the only credible evidence against the defendant consists of a chain of circumstances, that in such a case it is not sufficient that the circumstances coincide with, account for, and therefore render probable the guilt of the defendant. They must exclude to a moral certainty every other reasonable hypothesis."

"Before they can convict the defendant in this case it must appear, from the evidence, beyond a reasonable doubt, that. the defendant, and not somebody else, committed the offense charged in the indictment. It is not sufficient that the evidence shows that the defendant or somebody else committed the crime, nor that the probabilities are that the defendant and not somebody else committed the crime, unless those probabilities are so strong as to remove all reasonable doubt as to whether the defendant or someone else is the guilty party."

"The evidence tending to establish his" (the defendant's) "identity must be such as produces a degree of certainty in the minds of the jury so great that they can say that they have no reasonable doubt of the identity of the defendant."

And in the very instruction now under consideration the court said: "The burden of proof is upon the Territory and the law, independent of the evidence, presumes the defendant to be innocent and this presumption continues and attends him at every stage of the case until it has been overcome by evidence which proves him guilty to your satisfaction and beyond a reasonable doubt. * * * The doubt which will entitle the defendant to an acquittal must be a reasonable doubt, not a conjured up doubt, such a doubt as you might conjure up to acquit a friend, but a doubt that you could give a reason for.

A reasonable doubt is not a possible doubt, not a conjectural doubt, not an imaginary doubt, not a doubt of the absolute certainty of the guilt of the accused because everything relating to human affairs and depending upon moral evidence is open to conjectural or imaginary doubt and because absolute certainty is not required by law. The real question is whether after hearing the evidence" (and this and the next are the two sentences complained of in this exception) "and from the evidence you have or not an abiding belief that defendant is guilty and if you have such belief so formed it is your duty to convict. You should take all the testimony and all the circumstances into account and act as you have an abiding belief the fact is."

These various instructions sufficiently and correctly informed the jury of the definition of the words "reasonable doubt" and even if the expression "an abiding belief", if used by itself, could be held to be inexact and not sufficiently clear, certainly when used in conjunction with all the other statements throwing light upon what a reasonable doubt was, no claim of error can be sustained.

### III.

At the request of the prosecution, the court instructed the jury as follows: "If you find and believe, from the evidence, that any witness in this case has knowingly and wilfully sworn falsely to any material fact in this trial, or that any witness has knowingly and wilfully exaggerated any material fact or circumstance for the purpose of deceiving, misleading or imposing upon you, then you have a right to reject the entire testimony of such witness, unless corroborated by other credible evidence." Defendant excepted.

Two grounds of objection, among others, are urged in this court. One is that a mere exaggeration is by the

instruction placed upon the same plane as other false testimony; and the other is that by the instruction the jury was inferentially directed to accept the testimony of a witness who has sworn falsely in one material partic- ular if he is corroborated by other evidence which is credible. As to the first objection, it will be observed that the presiding judge was not, in this instruction, re- ferring to innocent exaggerations. What he did refer to was not only an exaggeration of a material fact or cir- cumstance but an exaggeration indulged in "knowingly and wilfully" and "for the purpose of deceiving, mis- leading or imposing upon" the jury. Such exaggerations are false testimony just as clearly as are other wilful departures from the truth. As to the second ground, we find it difficult to accept the view supported by some of the authorities cited for the defendant to the effect that such an instruction as that under consideration carries with it an implication that if the witness is "corroborated by other credible evidence" the jury has no right to re- ject his entire testimony even though it finds him to have sworn falsely in any material fact. Even standing by itself the language used seems to us to have been in- tended to mean that from the fact of falsity in one par- ticular the jury could properly reject the entire testi- mony of the witness in the absence of corroboration but that where there is corroboration, the mere fact of falsity in one particular would not be controlling but the jury would still be left at liberty to accept or to reject the testimony of the witness, in accordance with its impres- sions of the witness and his testimony gathered from the other and usual *indicia* by which juries are customarily guided in such cases, such as the appearance, the atti- tude, the manner and the motives of the witness and all of the other circumstances surrounding him. But the language above quoted to which objection is made did

not stand alone in the judge's charge. In the same instruction (No. 13) in which the language under consideration occurs, the jury was told: "You are the exclusive judges of the credibility of all the witnesses, of the weight of the evidence and of all the facts in this case. It is your exclusive right to determine from the appearance of the witnesses on the witness-stand, their manner of testifying, their apparent candor or frankness, or lack thereof, which witness or witnesses are more worthy of credit. In determining the weight to be given the testimony of the witnesses, you are authorized to consider their relationship to the parties, if any, their interest, if any, in the result of this case, their temper, feeling or bias, if any has been shown, their demeanor on the witness-stand, and their means and opportunity of information and the probability or improbability of the story told by them, and to give weight accordingly." It was also instructed: "You are the exclusive judges of the facts in the case and the credibility of the witnesses."

It is undoubtedly the law that the jury is the sole judge of the credibility of each and every witness and that it may, in accordance with its impressions and views derived at the trial, accept or reject the whole or any part of the testimony of any witness. It is also undoubtedly the law that when a witness has been found by the jury to have testified falsely in one or more material particulars it may either accept or reject the remainder of his testimony as true irrespective of the presence or absence of corroborating testimony but we think that neither the instruction under consideration taken alone nor all of the instructions on the subject taken together were intended to mean or could properly have been understood by the jury to mean that the trial judge was directing the jury that it must accept as true the evidence of a witness who had been found to testify falsely

in one particular simply because his evidence in other respects was corroborated by other testimony which was credible. The prosecution's instruction No. 13 regarded alone and all the instructions on the subject taken together left it to the jury to exercise its prerogative, as sole judge of the credibility of the witnesses, to either accept or to reject the testimony of the class of witnesses under consideration irrespective of the presence or absence of corroborating testimony.

## IV.

A witness for the prosecution (Christopher Holt) having testified that he had arrived on the scene of the shooting at about the time in question and saw a man running away from the prostrate form of what later proved to be the decedent, Ito, and having also testified that with the aid of the lights of the machine which he, the witness, was driving, he had seen a man run in a stated direction across the road and that that man had a cap on his head drawn forward in a manner described by the witness and that the man had on a dark suit of clothes and white covering for his feet, was asked the following question: "The man that you saw cross the road that night as you came along the Red Hill, along the road, the man whom you saw that night crossing the road diagonally as you have described here, how did he resemble or how does he resemble the defendant in size and physique?" To this question defendant objected "as incompetent, irrelevant and immaterial, no proper foundation laid, no testimony that he in any way resembled the defendant. He can describe him if he wants, and the question may then be proper." The objection was overruled. The witness answered, "You want to know what that man looked like?" Q. "Yes?" A. "Well he was a pretty well built man." Q. "Read the question

again." (Question read by reporter.) A. "Pretty near like him, something like him."

Mrs. Christopher Holt, who likewise had given testimony similar to that above recited as having been given by her husband, was asked: "This man that you saw on the night of December 2 at Red Hill crossing the road in front of your car, how did he resemble Mr. Buick as to size and physique?" To this question defendant objected "as incompetent, irrelevant and immaterial, leading and suggestive." The objection was overruled. The witness answered, "Well the man that I saw was what you call good built,—what you call a well built man, and I guess it is about Mr. Buick's build." In support of these specifications it is claimed that the questions were leading and that it was not competent for a non-expert to give his opinion on the subject involved. Whether a leading question is permissible under particular circumstances is a matter which must necessarily be left to some extent at least to the discretion of the presiding judge. In this instance we think that that discretion was not abused. It is well established that non-expert witnesses "may give their opinions, in connection with the facts upon which they are founded, when the matter to which the testimony relates cannot otherwise be reproduced or made palpable to the jurors, that they may draw correct or intelligent conclusions therefrom. In such cases the witness testifies as to the present conviction of his own mind as to an actual fact, though deduced from circumstances which cannot be made palpable to others." 12 A. & E. Ency. L. 488, 489. It is equally clear as an application of this principle that "as there are certain indications in the conduct, appearance and demeanor of another which cannot be adequately described to the jury a non-expert" may be "permitted to state his opinion based upon such indications" and that

"the opinions of non-experts are admissible to identify a person or thing, where the opinion is derived from knowledge and observation in the given case and the witness had the means of reaching a correct conclusion." *Ib.* 490, 491. The non-expert opinions in question were properly admitted.

## V.

The court permitted the prosecution to ask George Manoha, a witness who testified in support of the defense of an alibi, "In 1917, including the time when this shooting we have been talking about occurred, were you living in adultery with" a person named. The court instructed the witness that he would not be compelled to answer the question but could answer it if he wished to. The answer was "I don't wish to answer that question." The question was properly allowed. The law relating to the subject has been definitely settled in this jurisdiction and need not be now reconsidered. A witness on cross-examination "may be questioned as to specific acts and as to matters showing his general moral character in so far as this might affect his credibility. The reason of the rule excluding questions to other witnesses as to specific acts of the witness whose character is in question does not apply here because the witness, being examined himself, is not called upon to defend anything which he is not prepared to defend and his answers are binding upon the cross-examiner and cannot be rebutted by other witnesses and thus the danger of collateral issues is avoided. Moreover, if this could not be done a dishonest witness would have the same standing as an honest one and in most cases could not be impeached. His moral character can be shown (as distinguished from his character directly for truth and veracity) because experience shows that a person of general degraded char-

acter is not as worthy of belief as one of general good character. It is better that the witness be shown up for what he is, in the interests of truth and the rights of the parties, than that witnesses themselves be exempt from having their lives exposed to some extent and this exposure will be limited by the discretion of the judge and the interests of the party and his counsel. * * * Within reasonable limits a witness may, on cross-examination, be thoroughly sifted upon his character and antecedents. * * * Subject to the constitutional privilege of a witness to refuse to answer questions the answers to which may tend to criminate him, it is proper to show collateral facts that might tend to criminate, disgrace or degrade the witness if such other facts tend to weaken his credibility * * *. It is now an elementary rule that a witness may be specially interrogated upon cross-examination in regard to any vicious or criminal act of his life and may be compelled to answer unless he claims his privilege. The extent to which disparaging questions not relevant to the issue, may be put on cross-examination, is discretionary with the trial court, and its rulings are not subject to review here unless it appears that the discretion was abused." *Republic* v. *Luning,* 11 Haw. 390-393. To the same effect is *Territory* v. *Goo Wan Hoy,* 24 Haw. 721, 726, 727. There was no abuse of discretion in the allowance of the question.

## VI.

The defendant was arrested at about 2:30 o'clock on the morning of December 3, 1917. Shortly after three o'clock on the same morning, he was taken to Ito's bedside at the Queen's Hospital in the custody of two police officers. According to the testimony of one of these officers, Sizemore, the other officer, Kamauoha, "asked the Jap (meaning the decedent Ito) "if he ever saw this

man" (meaning the defendant) "before, and the Jap answered 'Yes' and pointed his finger to this man the defendant." Q. "What else did the Japanese say?" A. " 'But' he said 'this man have a cap on,' so I couldn't state just which one of the officers it was that started to put a cap on the defendant's head and the defendant grabbed for the cap like that (indicating) and said 'who?' 'me?' " Q. "And what did the Japanese say?" A. "He said 'Yes' in broken English as plain as I could hear him speak it." Q. "Did the defendant say anything at all between the time you left the hospital and the time you got to the police station?" A. "Not that I remember of, I never heard him speak." Kamauoha when asked, referring to the same incident at the bedside, what was said, answered, "Did this man shoot you?" Q. "Who said that?" A. "I did to the Jap." Q. "What Japanese?" A. "Ito." Q. "The man who was lying on the bed?" A. "Yes. * * * The Japanese said 'Yes this man shoot me but he got cap on at that time.' " Q. "What did Buick say if anything?" A. "He said something but I couldn't very well catch on to it. I don't remember exactly what he said." These questions were objected to and exceptions taken. The argument in support of the exceptions is that at the time of these alleged admissions by the defendant (no claim was made then or is made now by the prosecution that Ito's identification of the defendant was in the nature of a dying declaration) he was under arrest, in the custody of the police officers, that any statements or silence of his were not voluntary and that the occasion was not one calling for a denial by the defendant of the truth of the decedent's statements. The Supreme Court of the United States has said that "It has been settled that the mere fact that the confession is made to a police officer, while the accused was under arrest in or out of the prison, or

was drawn out by his questions, does not necessarily render the confession involuntary, but, as one of the circumstances, such imprisonment or interrogation may be taken into account in determining whether or not the statements of the prisoner were voluntary." *Bram* v. *United States,* 168 U. S. 532, 558. See also *People* v. *Amaya,* 134 Cal. 531, 535-538.

The trial judge in admitting the evidence evidently proceeded upon the theory that there were no circumstances of force or intimidation or inducements surrounding the incident at the bedside which would render the defendant's admissions or conduct at the time involuntary; and upon the evidence adduced we think that he could not have well ruled otherwise. Other than the mere fact of arrest, there were upon the testimony presented no facts of force or intimidation or inducements. The defendant, although under arrest, was entirely at liberty to deny the truth of Ito's accusation. The testimony was that he was within sight and hearing of Ito. His own testimony was to this effect. His own testimony corroborates in substance the incident as related by Sizemore and Kamauoha. The mere fact that Kamauoha testified that he did not "catch" the defendant's answer does not render the evidence inadmissible. The jury was at liberty to believe Kamauoha's testimony and, with its aid and that of the defendant's, to determine what happened at the bedside. The occasion and the circumstances were such that the defendant was afforded an opportunity to speak and Ito's accusation was such that naturally and ordinarily would have called forth a reply from an innocent person. The weight to be given to this evidence and to the defendant's two words in reply and to his silence otherwise, both at the bedside and on the way back to the police station, were matters entirely within the province of the jury to determine. It was

proper to submit this evidence to the jury for its consideration along with other evidence in the case in deciding upon the question of the guilt or innocence of the defendant of the shooting with which he was charged.

## VII.

Evidence was introduced by the prosecution tending to show the following: That on the Saturday following the day of the shooting, the county attorney, Detective McDuffie, the defendant, Mr. Carden (defendant's attorney) and one or two others went to the bedside of Ito at the Queen's Hospital; that while the defendant was standing at the foot of Ito's bed where he could see and hear Ito, the decedent pointed to the defendant and said "that is the man that shot me;" that the defendant said nothing in reply or at any time as he stood near Ito's bed; that this group just mentioned, after the interview with Ito was apparently ended, passed to the door of the ward in which Ito's bed was and that the defendant's attorney from there went to Ito's side, spoke to Ito and returning to the group at the door said that Ito said that he was not sure that the defendant was the man that shot him; that McDuffie thereupon immediately went to Ito, spoke to him and returning to the group at the door said in the presence and hearing of the defendant that Ito said that he was sure that defendant was the man who shot him; and that the defendant said nothing when this statement was made by McDuffie at the door and said nothing while returning with the same officers on the way back to the police station. Exceptions were noted by the defendant to the admission in evidence of the statement by McDuffie made at the door of the room where Ito lay and to the admission of the testimony to the effect that the defendant remained silent in the face of the accusation.

Exception was also noted to the giving of an instruction by the trial judge to the jury as follows: "I further instruct you that if you believe beyond a reasonable doubt that certain accusations were made against the defendant or to another in his presence, and that the defendant failed to controvert, qualify or explain such accusations and that he was in a position to do so, and that his conduct or attitude in this respect was voluntary, then you may consider such failure, if any, on the part of the defendant to controvert, qualify or explain such accusation in determining whether the defendant admitted the truth of such accusation."

It is argued on behalf of the defendant that the evidence in question was inadmissible, first because the defendant was under arrest at the time of the alleged acquiescence by silence and second because, since defendant's attorney was present, there was no natural call upon the defendant even if innocent to deny the accusation.

The mere fact that the defendant was under arrest and in the presence of police officers at the time of the making of the accusation does not of itself show that the alleged confession or acquiescence by silence was involuntary. *Bram* v. *United States, supra,* at page 558. There were no other circumstances in evidence tending to show that the defendant's silence was involuntary. On the second point, "whether a person is bound to speak when statements and declarations adverse to his interests are made, is often a perplexing question, and it is difficult to state a rule applicable to all cases, as the question so often depends upon the circumstances attending each case." *Pierce* v. *Pierce,* 66 Vt. 369, 375. We know of no rule of law or rule based upon human experience, to the effect that an innocent person wrongly accused of a most serious crime will naturally remain si-

lent simply because his attorney happens to be present at
the time the accusation is made.  The fact that the de-
fendant remained silent in the face of Ito's direct accu-
sation from his bed and that he likewise remained silent
when the accusation was repeated by McDuffie at the
door, was, in our opinion, properly permitted to go to
the jury as evidence, tending to show acquiescence on
the part of the defendant by his silence, of the truth of
the accusation.  The jury was, by the instruction above
quoted, left at liberty to decide for itself whether by
that silence, under all of the surrounding circumstances,
the defendant did acquiesce in the accusation.  It was
specifically told in this and other instructions that it
was the sole judge of all issues of fact and that it should
consider all of the circumstances in determining from
the evidence adduced what the facts were.  Jurors are
chosen largely because of their experience as men and of
their knowledge of the motives that ordinarily impel men
to act or to desist from acting.  Whether the evidence
was admissible at all was a question of law for the pre-
siding judge to determine (22 C. J. 325).  If it had a
tendency to show that the defendant by his silence ac-
quiesced in the accusation or felt unable to deny its
truth, it was admissible; but it was for the jury to say
what weight it would give to the evidence and to the de-
fendant's silence shown thereby, in connection with all of
the other circumstances of the case.  The defendant's
attorney took the stand in his behalf and denied that he
had been present at the Queen's hospital with the county
attorney, McDuffie and the defendant on the Saturday
in question or on any other day and denied that he ever
took part in any such incident as was described by the
witnesses for the prosecution.  It was for the jury to
determine whether to believe Carden's testimony or the
testimony of the county attorney and McDuffie.  It may

be that the jury accepted Carden's testimony as true and found that no such incident ever occurred at the door of Ito's room in the hospital; but, if, on the other hand, the jury disregarded Carden's evidence and gave credence to the testimony of the prosecution on the point and found that the accusation was repeated by McDuffie at the door as testified to by him, that defendant remained silent, that defendant was entirely at liberty to speak if he wished, that there was a natural call upon the defendant under the circumstances to deny the accusation if he was innocent, and that his silence meant acquiescence in the truth of the accusation, it cannot be said that these findings were without evidence to support them or that the defendant's silence under the circumstances as they occurred was not susceptible of constituting and proving acquiescence. There was no evidence from Carden or from anyone else either that the defendant had been instructed or advised by his attorney not to speak or that the defendant, without any such instruction or advice, explained at the time that he would leave the talking to his attorney. In the absence of some such explanatory evidence on behalf of the defendant it was competent for the jury to find from the evidence that the defendant's silence was of his own choosing and indicated acquiescence. The instruction as given by the court properly left all of the different steps and elements of this alleged acquiescence for determination by the jury alone.

## VIII.

On the occasion already referred to, of the visit of the county attorney, McDuffie, the defendant and one or two others to the decedent at the hospital on the Saturday next following the day of the shooting, Ito made a statement of the circumstances leading up to and surrounding

the shooting. Certain exceptions were noted by the defendant which raised the question of the admissibility of this statement as a dying declaration. There can be no doubt as to the law involved. As stated in 21 Cyc. 976, the general principle on which this species of evidence is admitted is that every declaration is admissible which is "made in extremity when the party is at the point of death and when every hope of this world is gone; when every motive of falsehood is silenced and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn, and so awful, being considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice." The only question is whether Ito's statement was made under circumstances such as these. The county attorney testified that this visit was made by him to the decedent's bedside with the appreciation that possibly Ito was about to die and with the purpose to ascertain what the facts were in that regard and whether or not Ito thought that he was about to die. This witness testified: "He was in a very weak condition and seemed to be suffering and the substance of his answers was that he expected to 'make.' I am pretty sure the word 'make' was used by him in the pidgin-English it was spoken. I am very sure he used the Hawaiian expression 'make,' as I understood, and used it in this connection. He said 'Me too much sick, bye and bye me make.' Those were either the words or that was the substance of what he said. That is just about what he said and my impression at the time was that he realized death was coming and coming rapidly." Q. "What does the word 'make' mean?" A. "To die, or death." McDuffie's testimony was as follows: "Mr. Brown" (the county attorney) "spoke to him" (Ito) "and asked him how he felt. Ito answered and said he was

very bad. Mr. Brown asked him if he realized the condition in which he was. He said he was in a very bad condition and felt very sore. Mr. Brown asked him if he realized whether or not he was going to die and Ito answered he was going to die and felt very sore and pointed to his injuries, putting his hand on the injuries that he had." The defendant's contention is that the decedent's answers as narrated by the county attorney show at most that the decedent at the time of the questioning thought that as a result of his injuries he would die at some time in the indefinite future but did not show that he had any realization or thought of an imminent death. This involves a consideration of the meaning of the words as used by Ito, "me too much sick, bye and bye me make." "Make" is a Hawaiian verb meaning to die. Such pidgin-English as this is in common use between Japanese and our English-speaking residents and is familiar to all of us. This court may properly take judicial notice of the meaning of such expressions. It is presumed to know that which practically all other English-speaking members of the community are familiar with. The trial judge evidently found that Ito's statement was in meaning and effect, "I am very sick, I shall die" or "I am about to die." That we understand to be the correct meaning of the expression rather than that the decedent intended to say, "I am very sick, I shall live a long time, I shall certainly die but that will be in the indefinite future, something perhaps still far off." There is no doubt upon the evidence that Ito was grievously injured by the shooting and that he well might have thought on the Saturday in question that he was about to die from his injuries. His history of the shooting was clearly admissible as a dying declaration and no error was committed by the trial judge in this respect.

## IX.

After defining murder in the first degree and murder in the second degree and after giving the statutory definition of malice, the presiding judge instructed the jury that "under the laws of the Territory of Hawaii when the act of killing another is proved, malice aforethought shall be presumed against the party who did the killing and the burden shall rest upon the party who committed the killing to show that it did not exist or a legal justification or extenuation therefor." An exception was noted to the giving of this instruction and in support of the exception it is argued (a) that such an instruction as this can properly be given only when on the evidence the court can say, and in giving the instruction actually does say, to the jury that there is before it a defendant who in reality has committed a killing and (b) that section 3863, R. L., on which the instruction is based is unconstitutional.

The instruction as given was in the precise language of section 3863 save for the harmless addition of the words "against the party who did the killing" immediately after the words "malice aforethought shall be presumed." We say "harmless" because the meaning of the statute clearly is that the presumption thereby authorized shall be a presumption against an accused. The giving of such an instruction as this is not equivalent to a finding or direction by the presiding judge that the accused did in fact commit the killing nor is it any indication of the state of mind of the presiding judge upon this question of fact. The issues raised by the defendant's defense of an alibi were definitely and clearly left to the jury for its sole determination and the instruction was obviously intended to apply, and could properly have been understood by the jury to apply, only in the event that it found that the defendant was the person who committed the killing.

But for another reason the instruction was inapplicable and harmless. As has been already said hereinbefore, there was no evidence in the case permitting a finding by the jury that the killing was without malice aforethought. Upon the evidence as it stood, it was compulsory upon the jury, if it believed that the defendant did the shooting, to find that the killing was with malice aforethought and that the offense was murder. Under these circumstances, the giving of an instruction concerning the statutory presumption of malice in such cases could not possibly have been prejudicial to the defendant. The constitutional question presented by counsel need not be considered.

## X.

After the jury had returned its verdict but before the discharge of the jury, the following proceedings were had: Mr. Carden (for defendant): "On behalf of the defendant we object and except to the verdict of the jury as being contrary to the law and the evidence and the weight of the evidence and give notice of a motion for a new trial; and further * * * I would ask Your Honor that we be permitted to note an objection and exception to the remarks of counsel made during the course of the argument to the jury wherein counsel made statements not borne out by the evidence, and argued to the jury that the objections made by counsel for the defendant to certain testimony offered to be introduced by the prosecution should be considered by the jury and were argued to the jury by counsel. Among those circumstances were the statement that the defendant, through his counsel, had objected to the calling of certain witnesses as to statements made by the deceased Ito to nurses and doctors at the Queen's Hospital subsequent to the date of the shooting and subsequent to the 8th of December, 1917, and call-

ing the attention of the jury to the objection made to such testimony by counsel for the defense. I will ask Your Honor to give me that exception *nunc pro tunc.*" The Court: "It is not a question of my giving you. The exception will be noted." Mr. Carden. "Will Your Honor enter the exception as made of that time?" The Court: "No I can't do that." Mr. Carden. "Well I will except to that ruling of the court." The Court: "Because that would not be—that would be out of my province. That would be out of my province. An exception was not taken at the time and I cannot make the record speak something which didn't occur. Your exception however will be noted of course." This objection, so entered after verdict, was made a part of the motion for a new trial. An affidavit of one of the attorneys for the defendant was filed in support of the motion and the attorney for the Territory who made the closing argument referred to in these exceptions made and filed an affidavit *contra.* In his affidavit counsel for the Territory denied that he made the statements to the jury attributed to him in the affidavit of counsel for the defendant and said that what he did say to the jury on the subject was the following: "Why did Mr. Carden, when testifying in his direct examination, not relate to you the conversation he had with the Jap at the hospital upon which he said he based his remarks to McDuffie that the Jap was not sure? Was he afraid of what Miss Macfarlane, Dr. Mermod, and other nurses there and those at Leahi Home might say? Remember, this Jap was shot December 2 and did not die until Decoration Day of the following year and was under the care and observation of the doctors and nurses of these institutions all that time. If we had brought it out on cross-examination we would have been bound by it. Was he laying a trap for us so that we would be bound by his answer, or was he afraid that they might say that

the Jap had always insisted that Buick was the man who shot him? Why did he say that? What was his reason?" It is undisputed that no objection was made, before the submission of the case to the jury, to the argument of the prosecuting attorney. The objection was first made after the verdict had been rendered. It was then too late. If the defendant felt aggrieved by any part of the argument for the Territory, he should have noted his objection at once, in order to permit the trial judge to rule upon the objection with a clear recollection of what had just been said by the alleged offending attorney and also in order that the presiding judge might have promptly admonished the jury, if he found that objectionable remarks had been made, against giving any weight or consideration to the argument. Moreover, it is to be presumed, from the fact of the denial of a motion for a new trial that the presiding judge accepted as correct the recollection of counsel for the Territory of what the argument to the jury was and rejected the recollection of counsel for the defendant on the point. As narrated by counsel for the Territory in his affidavit, the argument was not objectionable in law. It was a proper comment upon the failure of the defendant to bring out from one of his witnesses, other than himself, evidence upon a point which was relevant and of interest to the jury in the fulfillment of its duty.

## XI.

The bill of exceptions contains one hundred and forty-six exceptions. Thirty-eight of these have been argued under twenty-two subdivisions. We have here referred in detail to the ten subjects that have seemed to us deserving of such treatment. All of the exceptions argued have been carefully considered by us. Those not referred to in detail we find to be without merit.

The exceptions are overruled.

*W. H. Heen,* City and County Attorney (*H. E. Stafford,* First Deputy City and County Attorney, and *H. K. Ashford,* Second Deputy City and County Attorney, with him on the briefs), for the Territory.

*B. S. Ulrich* and *E. H. Beebe* (*Thompson, Cathcart & Ulrich* on the briefs) for defendant.