JAY O'HEARN v. STATE OF NEBRASKA.

FILED JULY 12, 1907.  No. 14,903.

1. **Criminal Law:** CONFESSIONS. Statements or confessions made in the presence of one accused of crime, who remains silent, are admissible in evidence, if the time, the place and the circumstances are such as to lead to the inference that the accused by his silence assented to the truth of the same.

2. ————: ,————. A statement made by a person under arrest charged with murder, upon a confession by an accomplice being read to him, and on being asked by a police officer if he wanted to make any statement in regard to it, that he would make his statement at the proper time, or that he would stand trial and tell his story then, *held* to show dissent rather than assent to the statement of the accomplice, and not to render it admissible in evidence as a tacit confession.

3. ————: EVIDENCE. When an accomplice has confessed and has gone upon the witness stand and testified to all the details of the crime, it is error to allow a number of other witnesses, who have heard him tell the same story at another time and place, who repeat in detail all that he told as to the occurrence.

4. ————: ————: REVIEW. Where a defendant voluntarily testifies as a witness in his own behalf, and the facts testified to by him, as well as sufficient other competent evidence, clearly show that he is guilty of the crime charged, a verdict of guilty will not be set aside on account of errors in the admission of evidence.

5. ————: SENTENCE. Under the circumstances of the case, punishment of death *held* excessive, and sentence reduced to imprisonment for life.

ERROR to the district court for Douglas county: ABRAHAM L. SUTTON, JUDGE. *Affirmed: Sentence reduced.*

*James P. English* and *H. B. Fleharty*, for plaintiff in error.

*W. T. Thompson, Attorney General*, contra.

LETTON, J.

The defendant, Jay O'Hearn, was charged jointly with Raymond Nelson, Leo Angus and Joe Warren with murder in the first degree by shooting and killing one Nels Lausten on the 20th day of January, 1906, while in the attempt to perpetrate a robbery. O'Hearn was tried separately, convicted, and his punishment fixed by the jury at death. The other defendants pleaded not guilty, but afterwards the defendants Angus and Nelson were permitted to enter a plea of guilty of murder in the second degree, and were respectively sentenced to imprisonment for life. The defendant Warren was tried and acquitted. Nelson at the

time of the killing was 21 years of age. He had been for some years addicted to criminal practices to such an extent that he was unable to tell how many times he had been confined in jail for larceny and like offenses. Angus was 19 years old, and had also been convicted and confined in the Douglas county jail for some minor offense, and these two had been released from jail a few days before the crime was committed. O'Hearn is about the same age as the others. He and Angus lived in South Omaha, and had been acquainted for a long time, but Nelson and O'Hearn did not become acquainted until the day before the shooting. About 9 o'clock on the morning of the day the crime was committed Nelson and Angus went to the home of O'Hearn in South Omaha before O'Hearn had arisen, got him out of bed, and the three left the house together. They went to and drank in a number of saloons in South Omaha and in Omaha. About noon Nelson and Angus went to Council Bluffs for the purpose of buying a revolver, Nelson giving as a reason for buying it in that city the fact that he could not buy anything in Omaha without it being reported to the police, and O'Hearn went to the restaurant in Omaha where he worked as a waiter. In the afternoon O'Hearn and Angus again met, and went to the Krug Theatre, and to the saloon adjacent and to other saloons. They met Warren at one of these saloons, and after the three were together for some time O'Hearn went home, meeting Angus, Nelson and Warren in the evening by appointment at a saloon in South Omaha, where an agreement was made among them to commit robbery. Warren was 23 years of age, and had never met Nelson before that night. From South Omaha they all went to the Tunnel saloon in Omaha, where it was proposed by Nelson that they go to Nineteenth and Cuming streets and see if they could find a saloon to hold up. They took a street car, got off separately, but afterwards met and decided to rob the saloon of Nels Lausten on the corner of Twenty-first and Cuming streets. It was arranged that Angus and Warren should stand guard out-

side and Nelson and O'Hearn go into the saloon, which plan was at once put into execution. When O'Hearn and Nelson entered the saloon, O'Hearn ordered three glasses of beer. Lausten drew the beer, and as he turned to place the glasses on the bar O'Hearn and Nelson drew their revolvers and ordered him to hold up his hands. At this time a man named Bonney was standing at the north end of the bar, near a screen. Both Bonney and Lausten evidently thought the young men· were joking, and on Lausten refusing to hold up his hands a shot was fired from a 32-caliber pistol, which penetrated his heart and killed him. Lausten did not fall immediately, but stepped forward and leaned upon the cigar case, while Nelson ran around the bar to the cash register, holding his pistol in one hand and emptying the till with the other. In the meantime Bonney started to leave, when O'Hearn ordered him to hold up his hands, and covered him with the revolver. Within a moment or two after the shot was fired, one Persinger came to the side door of the saloon and looked in, when O'Hearn threatened him with his revolver. Persinger then ran round the corner to the front of the saloon, and, looking in at the window, saw Nelson emptying the cash register and Lausten still leaning against the cigar case. He then ran across the street and gave an alarm. After the cash register was emptied, O'Hearn and Nelson ran out of the back door of the saloon. · From thence they went to Washington Hall, where they had arranged to meet Angus and Warren.

As to these facts there is no conflict in the evidence. The only fact as to which there is any substantial conflict in the testimony is as to whose was the hand that fired the fatal shot. O'Hearn testifies that the pistol which Angus and Nelson bought in Council Bluffs was a 32-caliber Smith & Harrington; that, when they met in the South Omaha saloon that evening, he took this pistol away from Angus because he was too drunk to have it in his possession, and that afterwards, on the street, Nelson asked him for the 32-caliber gun, saying he pre-

ferred it to a 38-caliber; that he then exchanged guns with Nelson, giving him the 32-caliber and taking the 38-caliber; that Nelson asked Angus for the cartridges he had procured in Council Bluffs to fit the 32-caliber gun, and Angus gave them to him. He says that, while he was in the toilet room in the Tunnel saloon before going to Lausten's place, Warren came in and took this pistol from O'Hearn's overcoat pocket and looked at it. He testifies that after he and Nelson entered the Lausten saloon, when Lausten refused to throw up his hands, he, O'Hearn, jumped back in the middle of the room and covered Bonney with his revolver; that Nelson was then standing to the left and south of him; that Nelson again ordered Lausten to put up his hands, then fired the shot, and that he, O'Hearn, fired no shot that night; that he was carrying the 38-caliber gun, and that as they ran from the saloon Nelson said he would rather have the 38 gun, as it would be bad if he was caught with the 32; that he would be apt to be picked up by the police any time they saw him; that they exchanged guns, and that he told O'Hearn to dispose of the 32. On the other hand, Nelson testifies that the 38-caliber Iver & Johnson gun belonged to him, and that it was never out of his possession from early in the evening of Friday until the next morning after the shooting when he gave it to Warren. He denies that he ever had the 32-caliber gun in his hands that night, and says that he never asked Angus for shells for it, and never loaded it. He testifies that, after they entered the saloon and ordered Lausten to hold up his hands, Lausten was in front of O'Hearn, and O'Hearn shot him; that he, Nelson, then ran around the bar and took the money out of the cash register, and that while he was doing this Lausten fell, and they ran away. He further testifies that, when they met at Washington Hall after the shooting, Angus asked O'Hearn: "What did you do, kill him?" And O'Hearn said: "Shut up; yes, I smoked him." This testimony as to the shooting and the talk with Angus is positively denied by O'Hearn.

Bonney testifies that the shot was fired by the man who stood nearest to him, and that the man who was farthest away took the money from the cash register while the other man covered Bonney with a gun. Persinger testifies that he was about to enter the saloon at the northeast door when he heard a shot inside and saw two men running from the rear entrance of the saloon. As he started to enter the side door, a man inside drew a gun upon him. This man was wearing a short light overcoat and a light hat, and at the trial he identified O'Hearn as the man. He immediately ran around the corner of the building to the Cuming street window, and saw a man taking money out of the cash register, wearing a long black overcoat and a black hat, while Lausten stood leaning against the cigar case. There is no dispute as to O'Hearn wearing a short light overcoat and a light hat that night.

On the day after the crime, Angus, Warren and Nelson, being under arrest, were questioned by the police officers, and their separate statements taken down by a stenographer, reduced to long hand, and after being read over to each of them were by each respectively subscribed. At the trial a part of the statements of Angus and Warren thus taken was offered in evidence by the state. The statement of Warren was relatively of little importance, and its admission was in no way prejudicial to the defendant, since it merely tended to corroborate his own testimony. The statement of Angus, however, contained matter of serious and grave import to the defendant. It was, in substance, to the effect that he looked in at the window of the saloon just as the shot was fired; that, as near as he could see, O'Hearn fired the shot, and that he saw O'Hearn at Washington Hall afterwards, and asked him if he shot the man behind the bar, and O'Hearn answered: "Yes, I smoked him." The defendant strenuously objected to the admission in evidence of the written statement of Angus, on the ground that it was incompetent; that it was not shown to have been made in the presence of the defendant; that it was made while he was in jail

and in the custody of officers upon this charge; that it was read in his presence by the authorities while he was under restraint for the purpose of trying to draw out a statement from him; and that his refusal to make a statement at the time should not be taken as evidence against him.

There are two questions presented relative to the introduction of this testimony: Was its admission prejudicial to the defendant? And was the evidence competent under the rules governing the introduction of confessions or admissions?

O'Hearn's own statements on the witness stand and other undisputed evidence in this case show clearly that O'Hearn is guilty of murder in the first degree, and, if the penalty for this crime were definitely fixed by the statute, no error prejudicial to the defendant could have been committed by the admission of any of the testimony which he asserts was erroneously received. He took the stand himself, and out of his own mouth he is convicted. By the law of this state, however, the punishment to be inflicted for the crime of murder in the first degree is left to the determination of the jury, the statute defining murder in the first degree providing that upon conviction thereof every person convicted "shall suffer death or shall be imprisoned in the penitentiary during life in the discretion of the jury." Criminal code, sec. 3. If by the admission of testimony which should not have been received it is probable that the minds of the jury were influenced to a greater degree against the defendant than if no such testimony had been received, then the error would be prejudicial to the defendant. This is especially so if the evidence erroneously received tends to excite in the minds of the jury that detestation for the crime and instinctive demand for the severe punishment of a man who takes the life of another without justification or excuse, which is common to the majority of men. While under the law the man who actually fired the fatal shot is guilty of no greater crime than the man who was present, assisting in the robbery, yet, unless a prior intent upon the part of both to kill

were shown, the natural tendency would be to impose the weightier punishment upon the one who actually fired the shot. In this case there is a direct contradiction between Nelson and O'Hearn as to which it was who fired the fatal shot. Nelson is corroborated to some extent by the testimony of Bonney and Persinger, but the principal evidence as to the act of shooting was furnished by Nelson, a self-confessed criminal, who could not tell upon the witness stand how many times he had been confined in jail for larceny and other offenses, who was apparently the instigator and ringleader in the perpetration of the crime, and who, it is shown, suggested to Angus and Warren that they had better turn state's evidence with him and place the crime upon O'Hearn's shoulders. His testimony was positively contradicted by O'Hearn; and who can say whether, in the absence of other testimony, the jury might not have given O'Hearn the benefit of the doubt and inflicted the lighter penalty? But, when the statement of Angus that the shot seemed to be fired by O'Hearn, and that O'Hearn after the shooting, when asked by Angus if he killed Lausten, said, "Yes, I smoked him," was added to Nelson's tale, this may have been the very factor which turned the scale in the minds of the jury between the imposition of life imprisonment or the infliction of the death penalty.

It is contended by the state that Angus' statement was admissible under the rule that confessions made by an accomplice in the presence of the accused are competent and proper to be received in evidence against him. This rule, however, is not of general application. The ground upon which it is based is the presumption that silence gives consent, and that if a man stands silent when the time, the place, the occasion, and the circumstances are such as would naturally or properly call for some statement or reply from an ordinary person under similar circumstances, then it is presumed that by remaining silent the accused person admits the truth of the accusation made against him. There is no doubt that under certain

circumstances the fact that accusations have been made against a person, and that he remained mute when every consideration called upon him to speak, may be shown to the jury, and under such circumstances the accusations made may be received as being in some sense admissions of the defendant; but, viewed even in the most favorable light, such evidence is weak and infirm, and the vicissitudes to which it may be subject in the course of transmission, depending, as it often does, upon the recollection of witnesses as to conversations, etc., renders it of doubtful value, and in grave and important cases the rules governing its admission ought to be restricted, rather than enlarged. Mr. Wharton makes a succinct statement of the rule as follows:·"If A, when in B's presence, and hearing, makes statements which B listens to in silence, interposing no objections, A's statements may be put in evidence against B whenever B's silence is of such a nature as to lead to the inference of assent." Wharton, Criminal Evidence (8th ed.), sec. 679. Mr. Underhill says: "For silence to be equivalent to a confession, it must be shown that the accused heard and understood the specific charge against him, and that he heard it under circumstances not only permitting but calling for a denial, taking into consideration the circumstances and the persons who were present." Underhill, Criminal Evidence, sec. 122. The statement of Angus was taken the day after the crime. About ten or twelve days afterwards the accused four were taken by the police officers to a small room in the city jail, and there the statement was read over to Angus in O'Hearn's presence, and Angus, upon being questioned, said that it was his voluntary statement, and that he signed the same. O'Hearn was asked by a police captain if he wanted to make any statement in regard to it. He said he did not; he would make his statement at the proper time, or that he would stand trial and tell his story then, as the witnesses variously testify. This was upon the day of the preliminary hearing and just prior thereto. The defendant had been taken to this room for

the purpose of procuring an admission from him. By his conduct and words he neither assented to nor denied the truth of the statement read, but indicated his purpose to make his own statement and tell his own story at the proper time. Under such circumstances, taking into consideration the fact that the defendant was under arrest, that it was sought by the officers in whose custody he was to elicit a statement from him as to the facts of the crime to be used against him, surrounded by hostile influences, and with the fear that what he might say might be misconstrued, or used to his injury, the fact that the defendant reserved his statement until some future time is far from giving countenance to the idea that he thereby assented to the statement which had been read in his hearing. So far from giving color to the idea of assent, it rather conveys to an unprejudiced mind the idea of dissent and the intention to tell the true facts himself. Perhaps the weight of authority in this country is with those courts which hold that the mere fact of arrest is sufficient to render a statement made in the presence of the prisoner, to which he makes no reply, incompetent evidence, for the reason that no assent can be presumed under such circumstances, and that the very surroundings of the accused in such case are such as to render it entirely proper and natural for him to keep silent in the fear of misquotation or misconstruction. A person in such a situation would naturally fear that the worst possible interpretation would be placed upon his language; that the memories of those present would lean to statements prejudicial to his interests, and that an officer seeking to convict might supply through zeal any defect in the statement which was actually made. One of the leading cases on this subject is *Commonwealth v. Kenney*, 12 Met. (Mass.) 235. The facts in this case were that one Russell was arrested for robbery. After the arrest the person robbed pointed to the defendant and said: "That man has stolen my money." To this the defendant made no reply. In the opinion Chief Justice Shaw says that in some cases where a decla-

ration of this kind is made in one's hearing, and he makes no reply, it may be a tacit admission of the fact, but that this depends upon certain facts, among which are whether the statement is made under such circumstances and by such persons as naturally to call for a reply if he did not intend to admit it. So, if he is restrained by fear, by doubts of his rights, or by a belief that his security will be best promoted by his silence, then no inference of assent can be drawn from his silence. And, with reference to the facts in the case, it was said that the defendant "might well suppose that he had no right to say anything until regularly called upon to answer." This rule has been followed in Massachusetts in *Commonwealth v. Walker,* 13 Allen (Mass.), 570; *Commonwealth v. Brailey,* 134 Mass. 527. See, also, *Merriweather v. Commonwealth,* 118 Ky. 870, 82 S. W. 592; *State v. Young,* 99 Mo. 666, 12 S. W. 879; *State v. Howard,* 102 Mo. 142, 14 S. W. 937; *State v. Weaver,* 57 Ia. 730. A contrary doctrine seems to find support in *Kelley v. People,* 55 N. Y. 565, and in *Murphy v. State,* 36 Ohio St. 628. The former case, however, has been somewhat weakened as authority in that state by the opinion in *People v. Smith,* 172 N. Y. 210, in which it is said: "Moreover, he was at the time under arrest and in the custody of an officer, and might well have been silent without its being regarded as an acquiescence in any act proved to have been performed." And in the latter case the competency of the evidence is doubted, but was admitted upon other grounds.

While the presumptions are against the theory that the silence of a prisoner gives his assent to statements made in his presence accusing him of crime, it is unnecessary to decide in this case that in no event and under no circumstances can a tacit admission of the truth of a statement made against him in his presence be made by a person under arrest charged with a crime. The evidence shows that O'Hearn did not remain silent, and did not assent either directly or indirectly to the truth of the statements made by Angus or Warren. Their admission

in evidence therefore was erroneous, and in the case of the statement of Angus it was of such a nature as in all probability operated to the prejudice of the defendant.

It may further be said that, if such a practice were permitted as the introduction in evidence of a written statement of this kind as original evidence where the person making the statement is within reach and can be produced, it would deprive the defendant of one of the most valuable rights granted to him by the constitution, namely, the right "to meet the witnesses against him face to face." It takes away from him the keen scalpel of cross-examination, the power to dissect and lay bare the truth, it may be, from amid a mass of falsehood. If an unscrupulous wretch should make a false statement in writing, and if the accused thought it necessary or advisable to refrain from denying it while under arrest, if this practice were tolerated, his defense would be made more difficult, and false swearers might find an easy method of perjuring themselves.

A number of other errors are assigned and have been discussed in the briefs and oral arguments. It seems that on the Monday after the shooting the defendants were taken by police officers to Lausten's saloon, and there, in the presence of a number of police officers and individuals called in for the purpose of listening and being made witnesses, Nelson was permitted to tell and act out the details of the tragedy, and Angus was also called upon to tell his story. The state was permitted to show at the trial that during these recitals O'Hearn with the other defendants rolled cigarettes and smoked them, though afterwards the trial judge told the jury to disregard the fact of cigarette smoking; and a number of witnesses were permitted, over the objection of the defendant, to recite in detail before the jury all that they could remember of what was said by Nelson and by Angus at that time and place in O'Hearn's presence. We are of the opinion that the admission of this evidence was improper for the reasons, first, that the circumstances in evidence

do not show that O'Hearn assented to the truth of the statements; and, second, that Nelson had already testified in the case and told the same story that he told at the saloon, and thus an undue repetition was made by the several witnesses of the story told by Nelson. The effect of the repeated narration of Nelson's story must necessarily have been to induce the jury to attach greater weight to it than to that of O'Hearn, told by himself alone.

Counsel for defendant concede that O'Hearn is guilty of murder in the first degree. They ask that the case be reversed, and that this court, in view of the fact that Nelson and Angus, who appear to have been co-conspirators and equally guilty with him, have been sentenced to imprisonment for life, impose a life sentence upon O'Hearn. We cannot, however, reverse the judgment of the district court and still reduce the sentence, since a reversal of the judgment carries with it the extinguishment of the sentence.

The verdict in so far as it responded to the issues of guilty or not guilty of the crime of murder in the first degree was fully justified, but in view of the evidence, which shows that Nelson, while not the oldest in years, was the oldest in crime, was the only defendant who was acquainted with the saloons in the part of the city where the crime was committed, that he with Angus purchased the revolver with which the fatal shot was fired, and that he was apparently the ringleader, and considering the further fact that the defendant has barely arrived at man's estate, it is our opinion that the punishment imposed, taking all the circumstances of the case into consideration, is excessive. Since the defendant acknowledged the crime, the judgment of the district court is affirmed, but the sentence of death heretofore pronounced is set aside, and the judgment and sentence of the court is that the defendant shall be imprisoned in the state penitentiary during life.

JUDGMENT ACCORDINGLY.