McCormick, Plaintiff in error, vs. The State, Defendant in error.

*May 7—June 18, 1923.*

*Criminal law: Evidence: Implied admissions: Inculpatory state-
ments in presence of accused: Acquiescence by silence: When
statements admissible: Bill of exceptions: Power of outside
judge to settle: Extension of time of settlement: Discretion
of court.*

1. Inculpatory statements made in the presence and hearing of
   one accused of crime, which he has an opportunity to deny
   and does not, and the truth or falsity of which is within his
   personal knowledge, are admissions of the accused by ac-
   quiescence, and as such are admissible in evidence.
2. The circumstances surrounding such statements, which are
   treated as admissions by defendant by acquiescence, must be
   such as would naturally call for some action or reply on the
   question of guilt.
3. As a rule, admissions by silence are not of great probative force
   and are to be received with great caution.
4. In a prosecution for murder, where the silence of defendant,
   when incriminatory letters were read to him by an attorney
   of his deceased wife, was maintained under such circum-
   stances as would neither manifest nor be indicative of guilt,
   the admission of such letters was error.
5. Since sec. 2873, Stats., requires the judge before whom an
   issue was tried to sign the bill of exceptions, the jurisdiction
   of such judge is thus continued until the bill is settled and
   signed and continues as to all matters thereto relating, in-
   cluding, necessarily, the power to extend the time to settle
   the bill, as provided by sec. 2831.
6. In view of the wide discretionary power thus vested in the trial
   court, a ruling extending the time to settle and sign the bill
   of exceptions for the greater portion of a year after the
   testimony was transcribed will not be disturbed on appeal.

Error to review a judgment of the circuit court for Rusk
county: W. B. Quinlan, Judge. *Reversed.*

The writ is to review the judgment and sentence of said
court, under which the plaintiff in error was found guilty of
murder in the first degree and sentenced to imprisonment in

the state penitentiary at Waupun for the term of his natural life.

For the plaintiff in error there was a brief by *Albert K. Stebbins* of Milwaukee, attorney, and *McGill & Williams* of Ladysmith, of counsel, and oral argument by *Mr. Stebbins.*

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, *L. M. Sturdevant* of Eau Claire, special assistant to district attorney, and *O. J. Falge,* district attorney of Rusk county, and oral argument by *Mr. Sturdevant* and *Mr. Messerschmidt.*

DOERFLER, J.    Plaintiff in error, hereafter called the defendant, and the deceased, on June 4, 1914, were married. The deceased prior to such marriage was a widow residing at White Cloud, Michigan, and it appears that she was the owner of property inherited from her deceased husband variously estimated at a value of between $40,000 and $50,000.    There is considerable evidence in the record introduced for the purpose of showing that defendant's object in contracting this marriage was to obtain possession of her property.    After the marriage the parties resided for a short period at Grand Rapids, Michigan, and on September 2, 1914, the defendant commenced an action for a divorce and immediately left Grand Rapids and proceeded to Seattle, Washington.    The deceased, claiming that the defendant had embezzled a large amount of her money, engaged an attorney named Shaw, residing at Grand Rapids, and the two proceeded to Seattle, where criminal proceedings had been instituted against the defendant, and, a reconciliation having been effected, such proceedings were discontinued and the parties then returned to Grand Rapids, and shortly thereafter removed to Ladysmith, Wisconsin, where they resided until the death of the deceased on August 5, 1915.

Considerable evidence was also introduced on the trial to

show that during a large part of the period covered by the marriage the deceased suffered from illness, it being the claim of the State that such illness was caused by the defendant by periodically introducing into her food small doses of arsenic. The illness became so serious that on July 25, 1915, her attending physician recommended the employment of a nurse; and it also appears that the nurse when so employed was directed by the physician to carefully guard her because of suicidal tendencies on her part. Such alleged suicidal tendencies were denied by the State, and it was claimed by the latter that the thought of suicide was artfully injected into the physician's mind, designedly, by the defendant, for his own protection and to mislead the authorities and thus prevent prosecution.

At about noon of August 5th the nurse accompanied the deceased to an outdoor toilet and there left her unattended for a very brief period, and upon returning assisted the deceased to the residence, where she and the defendant and the deceased sat down and ate dinner. Upon the recommendation of the physician pepsin capsules had been prescribed for the deceased, to be taken before meals, and what was thought to be one of these alleged tablets was taken according to directions on this occasion. About ten or fifteen minutes after the close of the meal the deceased became violently ill and suffered from spasms and intense pain, and shortly thereafter died. There was also evidence to show that the defendant, shortly after the deceased's death, went to this outdoor toilet. The physician found in the pool under the toilet a small vial which contained strychnine tablets, which had the form, color, and appearance of the pepsin tablets. A post-mortem examination disclosed the presence of strychnine in the deceased's stomach, and it is not disputed in this case that her death was caused by strychnine poisoning.

The foregoing facts represent but a few of the outstanding incidents disclosed on the trial, and we are of the opinion

that for the purposes of this review no further comment should be made upon the evidence, in view of our holding herein, and because it is desired that nothing herein stated of the evidence shall in any manner prejudice the parties on a retrial of the case.

The State contended that the deceased died from strychnine poisoning as a result of her partaking of a tablet placed in the vial by the defendant with homicidal intentions; while it was the contention of the defendant that the deceased's death resulted from suicide. There was no evidence in the record showing that the defendant had either purchased strychnine tablets, or that he had in his possession such tablets, or that he placed a tablet containing strychnine into the vial which contained the pepsin capsules prescribed by the physician. The evidence in the case was largely circumstantial and formed a proper basis for a jury to arrive at a conclusion in harmony with either of the theories presented by the parties. The question comes before this court solely upon an assignment of error on the part of the defendant's counsel that the introduction of certain letters hereinafter referred to was highly prejudicial to the defendant, and that by reason of the reception and introduction of such letters prejudicial error was committed against the defendant, on account of which he is entitled to a new trial. One Shaw, an attorney at law of Grand Rapids, Michigan, was called as a witness in behalf of the State, and among other things testified that he acted as attorney for the deceased in the divorce case begun by the defendant against her on September 2, 1914, and that he accompanied the deceased to Seattle, where the defendant was located and where the criminal proceedings heretofore referred to were pending. His testimony also shows that he had acted for the deceased in a professional capacity on other occasions and that he had also been employed by the defendant to transact business for him.

On the 29th of October, 1915, while contest proceedings

McCormick v. State, 181 Wis. 261.

were pending in the circuit court over the will of the deceased, the witness received a telegram from the defendant informing him that the defendant would arrive from Chicago that evening and requesting an interview upon important business. The letters hereinafter referred to had, prior to such interview, been sent by the witness to one Kirwan, district attorney of Rusk county, at Ladysmith, and before reading any of these letters to the defendant at said interview the witness stated that he could not act as attorney for the defendant if criminal proceedings were to be prosecuted against him on account of the death of his wife. Thereupon the witness, in order to inform the defendant of the nature of the letters sent by him to the district attorney, read such letters to him, the witness stating that the defendant ought to understand his position before he made any statement. He further testified that the defendant replied generally to all of the statements contained in the letters by saying that the criminal matters had all been settled; that there would be no criminal proceedings, and that none of those letters need interfere with the work he, the defendant, wanted the witness to do for him. The letters were thereupon offered by the State in evidence, and received, over proper objections made by defendant's counsel.

Exhibit No. 27 reads as follows:

"Prosecuting Attorney,                    September 23, 1915.
      "Rusk County,
             "Ladysmith, Wisconsin.

"Dear Sir: We have heard indirectly of the death of Ida J. McCormick, formerly Ida J. Matheson of White Cloud, Michigan, and the wife of *Astor H. McCormick,* whom we understand was living with Mrs. McCormick at Ladysmith at the time of her death.

"Mrs. McCormick not long ago, in our office, requested us to promise her that in case of her death to make a thorough investigation, as at that time she feared that her husband would cause her death for the purpose of securing

her property, and therefore we are writing you, and we request that this letter be kept strictly confidential, at least until such time as it may be necessary to disclose it, if you should deem prosecution justifiable.

"Mrs. McCormick first came to us at the time that *Mr. McCormick* started divorce proceedings against her in this county, September 4, 1914. *Mr. McCormick* had left the city taking with him about $12,000 of Mrs. McCormick's money, who formerly was the wife of a saloonkeeper at White Cloud, who had accumulated about $40,000 which he had left to Mrs. McCormick, and she was then a widow about three years. She became acquainted with *McCormick* through correspondence, having first heard of him through a lady friend at Seattle, Washington, where *McCormick* lived. *McCormick* came here and married her about four months before he left her. Mrs. McCormick could not believe that he had gone and taken this money with intent to rob her, but that he had got into some trouble. However, we finally convinced her that it was his intention to get as much as he could and desert her, and that he brought the divorce proceedings in order to make it impossible for us to obtain a warrant against him for wife desertion and bring him back. Mrs. McCormick told us of at least two attempts he had made to poison her. She still, however, was desperately in love with him and would do anything to coax him back. We located him in Seattle, where Mrs. McCormick was determined to go.

"We succeeded in getting him arrested, but she insisted that he be not held, thinking that he would turn against her. We went to Seattle with her and found that he had left the day we arrived, and also found that he had a wife and daughter there, and we urged Mrs. McCormick to have him arrested for bigamy, to which she would not consent. The police department of Seattle informed us that he had a very bad reputation there, but that he had no money and never had any. He had three or four grown children in Seattle by a former wife, and the second wife with whom he was living was a common-law wife. While there we had him thoroughly investigated by detectives. Mrs. McCormick was so anxious to get him back that we made an arrangement with the attorney for him in Seattle that we would bring

no prosecution if he would return to her, and thereafter, we think, he returned to Michigan. The divorce case was never dismissed, but he went back to live with her and moved to Ladysmith, Wisconsin.

"We could get many more facts in connection with the matter if necessary, but give you this information so you may know why we are writing you. We know nothing of the circumstances of her death. The rumor here is that Mrs. McCormick committed suicide, which leads us to a strong suspicion that *McCormick* was at the bottom of it. As near as we can tell, Mrs. McCormick had about $25,000 when she moved to Ladysmith.

"We would be pleased to hear if any investigation, if any, has been made of the details of her death. Also, the condition of her property and whether or not she left a will, or whether she deeded the property to him before her death. Mrs. McCormick's father and mother are old and we understand also reside at Ladysmith. Her remains were brought to Michigan for burial, and possibly the old folks have returned here.

"Yours truly,          NICHOLAS & SHAW,
                  "By —— ——."

Exhibit No. 28 reads as follows:

                  "October 1, 1915.
"Mr. Chas. Kirwan, District Attorney,
          "Ladysmith, Wisconsin.
"Dear Sir: Your letter of the 27th received. When we wrote you before we had not heard any of the details of Mrs. McCormick's death, but a day or two afterwards saw the inclosed clipping in one of our Grand Rapids papers. There is no doubt whatever in our minds but that *Mr. McCormick* is responsible for his wife's death. As we wrote you in our last letter, it was not very long ago that Mrs. McCormick while in our office requested us to promise her that in case we heard of her death we would make a thorough investigation. She stated at that time that she believed her husband would attempt to kill her.

"*Mr. McCormick* filed a bill for divorce in this county on September 4, 1914. His purpose in doing so was to avoid arrest for desertion. Mrs. McCormick didn't want a di-

vorce. At that time *Mr. McCormick* had attempted to poison her at two different times; on one occasion he put some poison in her coffee, and on another occasion he injected some poison into her arm while she was asleep. Mrs. McCormick told us all about these attempts to take her life, but in spite of this was desperately in love with *McCormick* and insisted that we do everything in our power to locate him and persuade him to her. We finally, through detectives and through the sheriff's office, located him at Seattle, his former home, where he was arrested and was immediately released because of Mrs. McCormick's refusal to place any charge against him.

"We immediately left with Mrs. McCormick for Seattle and arrived there a day or two after his arrest. We employed detectives there and located him at 1020 Sixth avenue in Seattle. We then learned for the first time that he was living with wife No. 2 at that place at an old tumbled-down rooming house. We found that he had obtained a divorce from wife No. 1 some years before. Wife No. 2 claimed to us that she had been legally married to *McCormick* in Canada and that her child, as we remember, is about nine years of age, was *McCormick's* child.

"*McCormick's* attorney at Seattle claimed that wife No. 2 was a common-law wife. We learned while there that *McCormick* had told wife No. 2 that he was going East in order to have his eyes treated. She did not know that he had gone to Michigan and married Mrs. McCormick No. 3 until we informed her of this fact.

"*McCormick* represented to his wife No. 3, Mrs. Ida J. McCormick, that he was very wealthy, that he owned mining stock and considerable real estate in Seattle, claiming to have more property than Mrs. McCormick had. When *McCormick* left Grand Rapids, as near as we can tell, he had taken about $12,000. He had tried in many ways to get Mrs. McCormick to give the balance of her property in his hands, and would have accomplished his purpose if it had been possible for Mrs. McCormick to have sold the balance of her property, most of which was in real estate.

"The mother of Mrs. McCormick No. 1 lives at 6527 Jones avenue, Seattle, Washington. Her name is Mrs. Susan Clark. The name of wife No. 1 before her marriage was Dora Clark. She obtained a divorce from *McCormick* about twenty-four years ago.

McCormick v. State, 181 Wis. 261.

"The name of wife No. 2 is Emma Conover. She was married about eight or nine years ago. We found that *Mr. McCormick* used the names Arthur H. McCormick, John H. McCormick, but were told that his full name was *John Henry Astor Jacob McCormick.*

"The detectives at Seattle who worked on the case were the Cody Detective Agency. They may have kept the record of the information obtained by them. We do not seem to have the name of *McCormick's* attorney at Seattle, but could obtain this information from the attorney there retained by us, Mr. J. H. Cain, of Farrell, Cain & Stratton, American Bank Building, Seattle. *Mr. McCormick's* attorneys in Grand Rapids were Smedley & Linsley.

"The divorce case filed in this county was never tried nor dismissed. However, the fact that Mr. and Mrs. McCormick went back and lived together would amount to the same as the dismissal of the case.

"Mrs. Helen Glass of this city lived just across the hall from Mrs. McCormick at the time her husband attempted to poison her. I called her over the phone yesterday and she is to come into the office today. She will remember the details of the attempted poisoning. She said over the phone that she saw Mrs. McCormick's arm at the time and that there was no question in her mind that Mrs. McCormick was poisoned.

"One of the constables here in Grand Rapids by the name of Nichols (not related to Mr. Nichols of our firm) spoke to me the other day on the street after having read the article in our Grand Rapids paper. He worked some on the case here in Grand Rapids and I told him to write you any information which he had about the matter. We would be interested to know whether or not the note supposed to be left by Mrs. McCormick was in her handwriting. We are positive Mrs. McCormick was in no frame of mind to take her own life, especially as she stated to us so recently that she feared death by the hands of her husband. If you desire any further information which we can furnish, we would be glad to do so. We will write you again after our interview with Mrs. Glass.

"Yours sincerely,        Nicholas & Shaw,
                "By ―― ――."

The letters above set forth refer to incidents which cover

to a large extent the period of time during which the parties lived together in the marriage relation, many of which are of vital importance in the determination of the guilt or innocence of the accused. The contents of these letters may be classified as follows:

1. Requests to the witness Shaw, by the deceased, to make an investigation upon her death, based on fears which she entertained that the defendant would take her life in order to secure her property; and also a recital of attempts by defendant to poison her.

2. Reports by police officials relating to defendant's prior marriage, his relations with women, and his alleged general bad reputation.

3. Convictions entertained by the witness of defendant's guilt, and that the deceased did not commit suicide.

4. Assertions on the part of the witness that the motive of defendant in marrying the deceased was to acquire her property.

5. A statement to the witness by one Helen Glass, of Grand Rapids, over the telephone, in which she related an alleged attempt on defendant's part to poison the deceased by the injection of poison into her arm.

These letters were introduced upon the theory that they constituted an admission of guilt, by silence. The rule as laid down by this court in *Richards v. State,* 82 Wis. 172, 178, 51 N. W. 652, is as follows:

"The rule is fairly to be deduced from the authorities cited to the point by the respective counsel that inculpatory statements, made in the presence and hearing of one accused of crime, which he, having opportunity to do so, does not deny, and the truth or falsity of which is within his personal knowledge, are admissions of the accused by acquiescence and as such admissible in evidence."

While the doctrine laid down in the *Richards Case* undoubtedly is in harmony with the authorities generally in other jurisdictions, and while no exception can be taken to

such rule as applicable to the particular facts in that case, other elements enter into the question of the admissibility of such evidence in certain cases, and the one with which we are primarily concerned in the instant case is involved in the consideration of the question whether the circumstances under which the letters were exhibited and read to the defendant by the witness Shaw were such as to require a reply which would involve the question of the guilt of the defendant. The circumstances must be such as would naturally call for some action or reply on the question of guilt. *People v. McCrea,* 32 Cal. 98; *Kirby v. State,* 89 Ala. 63, 8 South. 110; *O'Hearn v. State,* 79 Neb. 513, 113 N. W. 130.

The rule as laid down in the *Richards Case, supra,* finds its origin in the common knowledge of mankind of human nature, and involves the reaction which takes place in every normal being upon being charged with crime. It takes cognizance of the resentment which naturally follows an accusation of crime of which the accused is not guilty, and briefly reproduces before the jury the demeanor and conduct of the accused under the circumstances involved. It is oftentimes of great value in establishing the identity of the accused, in fixing his whereabouts at or about the time of the commission of the crime, of his possession and ownership of certain instrumentalities used in the commission of crime, and of numerous incidents of vital importance in establishing guilt in a criminal trial. And it logically follows that evidence so introduced may have greater or lesser probative force in accordance with the particular circumstances involved in each case and the general mental and moral make-up and fiber of the person charged. The reactions of different people suddenly charged with crime, as is well known, differ, so that in the final analysis the probative force of such evidence, when admitted, is for the jury under proper instructions. *Davis v. State,* 131 Ala. 10, 31 South. 569. The evidence is received not as evidence in itself, but

in order to enable the jury to understand what reply the accused should make to such charges, and the conduct and reply of the ordinary, prudent person under the same or similar circumstances.

The witness Shaw was an attorney at law, and prior to the death of the deceased had acted in her behalf in a professional capacity on a number of occasions. He had also acted as counsel for the defendant. Previous to the interview defendant wired the witness from Chicago that he was coming on to Grand Rapids to consult him on important business, and it developed that the object of his visit was to retain the witness in a professional capacity in the matter of the contest which was pending over the will of the deceased. The record does not disclose that the defendant contemplated retaining Shaw in the defense of a criminal action. It is also clear that Shaw's purpose in reading these letters was to inform the defendant of his activities as disclosed by the letters, so that the fact might be established as to whether criminal proceedings were either pending or contemplated, and to enable the defendant, with full knowledge of all the facts, to determine his course of action on the matter of the employment of the witness.

We come then to the very vital and controlling consideration as to whether an ordinary, prudent person similarly situated would naturally make a reply as to his guilt with respect to the numerous incidents involving crime contained in these letters, and particularly whether the defendant in remaining silent can be deemed to have acquiesced in such insinuations so as to constitute these letters competent evidence against him. The reply which defendant made was that no criminal prosecution was contemplated and that all matters of a criminal nature had passed by; that it was not necessary for the witness to consider such matter; and that he could consistently and logically act for the defendant in a professional capacity in the matter involving the will contest.

McCormick v. State, 181 Wis. 261.

We would very much hesitate to believe, under the evidence in this case, that the letters referred to were read to the defendant by the witness, at a time when the defendant was seeking to establish the confidential relationship of attorney and client, for the purpose of obtaining evidence to establish the guilt of the defendant of a criminal charge. We are rather inclined to the belief that Shaw's object in reading these letters at the time in question was to enlighten the defendant of the things that he had done, so that the defendant might be fully advised of the desirability of employing him as counsel. Such was the import and the trend of the conference, and we cannot say that the reply made by the defendant was incriminating, or that his silence may be deemed as an acquiescence in the truth of the charges contained in the letters. Every object and purpose for which the conference was held was fully met, and apparently to the satisfaction both of the attorney and the defendant. The attorney unbosomed himself with respect to what he had done, and the defendant thereupon, in substance, expressed his conviction that the criminal phase of the proceedings had passed by and that no criminal prosecution would follow, and such reply was made in order that Shaw might see his way clear to be retained on the will contest. Admissions by silence, as a rule, are not of great probative force, and such admissions are to be received with great caution. 16 Corp. Jur. pp. 631, 632, § 1256. See, also, *Godwin v. State,* 24 Del. 173, 74 Atl. 1101.

From the foregoing we conclude that the silence of the defendant was not maintained under such circumstances as would either manifest or be indicative of guilt, and therefore the introduction of these letters constituted error. Little need be said of the prejudicial nature of the contents of these letters. Numerous incriminating incidents are there referred to, none of which are based upon the personal knowledge of the witness, but, on the contrary, represent his conclusions from alleged investigations made and the

reports and conclusions of others.    The silence of the defendant, under the circumstances, would amount at most to an acquiescence in the mental operations of Shaw and of others referred to in the letters, which he was in no position to controvert.

Having held that the introduction of the letters constituted prejudicial error, it becomes unnecessary to consider the assignment of error under which, it is claimed that prejudicial error was committed by the court in its instructions.

Counsel for the State moved to strike out the bill of exceptions, first because Judge QUINLAN, an outside judge, had been called in to try the cause, and because after judgment and sentence he extended the time to settle the bill of exceptions, it being the contention of counsel that he had no jurisdiction of the matter.    The time was extended under the provisions of sec. 2831, Stats., authorizing such extension in a proper case by the court or a judge, and it is claimed that such statute does not confer authority upon the judge or court outside the judicial district in which the proceeding is pending to make such an order.

Sec. 2873, among other things, requires the judge before whom the issue was tried to sign the bill.    The jurisdiction of the trial court or judge is thus continued until such bill is signed.    While no authorities are cited in respondent's brief in support of its contention, and while we have been unable to find any on the subject, it must be inferred from the provisions of sec. 2873 that the jurisdiction of the trial court or judge for this special purpose continues as to all matters relating to the settlement and signing of the bill,. which would necessarily include the power to make the order extending the time; and it further appears that such trial judge is in a position best qualified, by reason of his connections with the case, to pass upon an application for such an order.    The authorities and text-books on the subject also indicate that the trial judge is a proper official to extend the time.

Counsel for the State further contend that no sufficient

showing was made upon which to base an order extending the time. The attorneys for the parties, on October 30, 1918, signed and filed a stipulation that the testimony when transcribed should be filed by the court reporter and attached to the writ of error, and the record be transmitted to the supreme court for its review. It is true that it appears that the greater portion of a year elapsed after such testimony was transcribed before an application was made for an extension of the time to settle and sign the bill of exceptions. These matters were fully before the trial court at the time the application for the order extending the time was made, and no one was better able to determine whether such alleged neglect was excusable than the trial judge. He undoubtedly had in mind the size of the record and all the facts and circumstances connected with the matter, and in view of the wide discretionary power vested in the trial court in a matter of this kind, and the importance of the case, we do not feel justified in disturbing his ruling.

*By the Court.*—The judgment and sentence of the lower court is therefore reversed, and the cause remanded for a new trial. The warden of the state prison at Waupun will surrender the plaintiff in error, *John Astor·Harrison Blake McCormick,* to the sheriff of Rusk county to be by him held to abide the further order or judgment of the court.