# TERRITORY OF HAWAII *v.* WILLIAM H. CORUM.

## No. 2257.

Argued February 11, 12, 1937.        Decided May 11, 1937.

COKE, C. J., BANKS AND PETERS, JJ.

168

OPINION OF COKE, C. J.

William H. Corum, a member of the Honolulu police force, was indicted by the grand jury of the first judicial circuit of the Territory of Hawaii on the 30th day of July, 1935, for the murder of his wife Marjorie Corum on July 3, 1935. At the trial, the defendant on October 1, 1935, was found guilty by a jury of the crime charged and was sentenced to be hanged. This writ of error is prosecuted to the verdict and sentence. A great number of witnesses, both expert and nonexpert, were called by both the prosecution and the defense, the transcript of evidence being extremely voluminous. We will summarize briefly some of the more salient facts brought out at the trial.

The defendant and Marjorie Corum were married in Honolulu on July 20, 1934. They were young people of about equal age and after their marriage took up their abode in an apartment at 2163-B Atherton Road, city of Honolulu. Corum was a patrolman-clerk in the Honolulu police department until he resigned on July 8, 1935. Marjorie Corum, the deceased, was a registered nurse employed at the Queen's Hospital in Honolulu in the capacity of floor supervisor. The hospital was located some two or three

miles from her place of abode. She was on duty at the hospital during the entire day of July 3 and was last seen alive by an acquaintance around 7:45 p.m. of that day at which time she was sitting near the nurses' home in the hospital grounds. Shortly after 8 p.m. she was heard by a neighbor to enter the apartment shared by herself and husband on Atherton Road. Between 9:35 p.m. and 9:40 p.m. of the same day Corum appeared at the rear door of the home of Mr. and Mrs. Meyer, neighbors who lived but a few feet distant, and requested the use of the telephone, stating at the time that his wife had shot herself. The neighbors immediately phoned to Dr. French who also lived in the vicinity and who received the call about twenty minutes to 10 o'clock. The doctor immediately responded to the call and in company with the defendant and Mr. and Mrs. Meyer went to the Corum residence where Mrs. Corum was found lying on a bed dead from a pistol shot wound. She was dressed in a kimono and light underclothing and was face up crosswise of the bed near the head thereof. Her hands were loosely clasped across her bosom, in her right hand was grasped a white handkerchief and her toes were in contact with the floor beneath the edge of the bed. There was a bullet wound above the third interspace to the left of the sternum. The course of the bullet was directly through the heart. At that time rigor mortis had not yet developed and death apparently had taken place but a short time, perhaps not more than thirty minutes, previously. A 32-caliber automatic pistol was lying on the bed near the left elbow of the deceased. An exploded shell fitting the pistol was found between the foot of the bed and the bedclothing. A large quantity of blood was on the exterior of the body of deceased in the vicinity of the wound and on the bedclothing and furniture close by. One blood spot was some six feet from the head of the deceased. The bullet had penetrated the body rupturing the auricles of

the heart, had passed through the base of the left lung and out through the back at a point slightly to the left of the spine. It was found embedded in the mattress directly below the point of entrance into the body. The course of the bullet indicated that it had been fired vertically and the wound was of such a nature as to cause almost instant death. The wound at the entrance was clean and about the size of the bullet. It was neither jagged nor frayed as would have been the condition had the weapon been fired while in contact with the body. No powder burns or powder residue were found on the skin or flesh at or near the aperture of the wound nor on the brassiere or other clothing adjacent to the wound. The bedding, furniture and fixtures in the room where the body of the deceased was found and the clothing in which she was garbed were all in a natural and undisturbed condition and the body was free from exterior bruises or abrasions, all indicating the absence of any struggle or assault prior to the infliction of the death wound. The defendant admitted the ownership of the death weapon. He testified that about a month prior to the tragedy he had placed the pistol in a chiffonier drawer in the bedroom and that he had subsequently neither possessed nor handled it. No distinguishable fingerprints were found on the exterior of the weapon following the death of Mrs. Corum. There was, however, an impression of the defendant's right thumb on the magazine (referred to in the testimony as the clip) of the pistol. The magazine contains the loaded cartridges and is carried in the interior of the handle or grip and held in place by a spring clasp. Whether the thumbprint was of recent origin could not be determined.

Major Thrasher, an army officer, was visiting at the Hastings home near the Corum apartment during the whole of the evening of July 3, 1935. He testified at the trial that sometime between twenty minutes of 9 p.m. and

ten minutes after 9 p.m. his attention was drawn to a single report or explosion near by which the witness recognized as a pistol shot.

Mr. and Mrs. Finkenbinder, who lived in quarters under the same roof and adjacent to the Corum apartment, testified that between 9 p.m. and 9:15 p.m. they heard what resembled the explosion of a giant firecracker close by. Mr. Finkenbinder definitely located the Corum apartment as the place from which the sound emanated. Shortly after the body was discovered Dr. Faus, city and county physician, arrived at the scene. He subsequently performed an autopsy and pronounced the death to be suicidal. The defendant was taken to the police station shortly after midnight following the tragedy, was questioned at length by the police authorities, and a paraffin test for powder residue on his hands, as well as on the hands of the deceased, was made by Dr. McVeagh, a ballistic expert. After removing the paraffin cast from the hands of the defendant and the deceased he applied a reagent known as diphenylamine which, it is claimed, will disclose the presence of nitrates or nitrites, if any, upon the paraffin after application to the human skin. The result of these tests was negative as to the hands of the deceased but the test applied to the right hand of the defendant produced flaky nitrates and nitrites similar to gunpowder residue.

The defendant was detained in custody by the police for a brief time following the tragedy and then released. Thereafter, as aforesaid, the grand jury returned an indictment charging him with the murder of his wife, since which time he has been held in prison. At the trial before the jury the defendant attempted to establish an alibi. He took the witness stand in his own behalf and denied all responsibility for the death of Mrs. Corum, his testimony being that he was not at home at the time of the tragedy and had no knowledge of it until he arrived there and found his wife

lying dead upon the bed in the sleeping room of their apartment. The defendant related in detail his movements during the evening of July 3, 1935. He testified that his wife Marjorie called for him at the home of Sergeant of Police Coxhead on Pensacola Street at about 7 p.m., that they, together, then proceeded by automobile to a sandwich stand at Waikiki, that after partaking of a light meal they drove to their home on Atherton Road, arriving about 8 p.m. They entered the apartment and after remaining about fifteen or twenty minutes after 8 p.m. defendant departed, leaving his wife at home and that he again went to the Coxhead residence; that he did not return to the apartment on Atherton Road nor did he see his wife again until he found her dead body as heretofore described. The defendant called a number of witnesses in support of his alibi and through them he endeavored to corroborate his own testimony to the effect that he was not, and could not have been, present at the time and place his wife received the mortal wound which terminated her life.

The evidence introduced by the government in support of the charge laid in the indictment was wholly circumstantial. No witness was produced who claimed to have seen the infliction of the death wound or to have been present when the deceased was shot. It was the theory of the prosecution that it was a physical impossibility for Mrs. Corum to have fired the pistol which terminated her life. It was shown that she was a young woman of unblemished character possessing a kind, happy and congenial disposition without known enemies. The prosecution introduced evidence showing that the defendant for some time prior to the death of his wife had carried on a clandestine and illicit relationship with a young unmarried woman by the name of Catherine Lane who lived at the Coxhead home on Pensacola Street. It was shown that Miss Lane had as a result of these relations become pregnant with a child.

That she and Corum had contemplated and planned marriage as soon as Corum was able to procure the termination of his existing marriage status. It was shown by the defendant's testimony that he had recently urged his wife Marjorie to institute divorce proceedings. These facts, it is claimed by the prosecution, created a motive for the crime. It was shown that within a month of the death of his wife Corum married Catherine Lane. The defendant made numerous contradictory statements especially in relation to his movements on the evening of his wife's death. The presence of what was claimed to have been residue of burned powder upon the defendant's right hand within a few hours after the tragedy was testified to by Dr. McVeagh. These and other facts and circumstances damaging to the defendant were recounted by witnesses produced at the trial.

The defendant assigns 42 separate errors alleged by him to have been committed by the trial court. We will first examine the errors relied upon which seem to us deserving of the most serious consideration, namely, assignments of error 20 and 21 which have reference to the admission over the objection by counsel for defendant of the testimony of one Pink L. Murphy and the subsequent denial of defendant's motion to strike the evidence. As will hereafter appear the disposition of these two assignments will be determinative of this appeal. We reproduce in the margin* that portion of the testimony of Murphy bearing upon the issues of law involved.

---

* "Q  Do you know the defendant in this case, William Corum, Mr. Murphy?

A  I do. * * *

Q  Now, Mr. Murphy, has your acquaintanceship with Mr. Corum always been of a friendly nature?

A  Yes, sir.

Q  And did you have occasion to visit Mr. Corum at the city and county jail?

A  Yes, sir.

Q  How many visits did you pay him?

174

It may be stated as a general rule that where a statement is made in the presence and hearing of an accused incriminating in character and such statement is not denied, contradicted or objected to by him both the statement and the fact of his failure to deny are admissible on a criminal trial as evidence of his acquiescence in its truth. This is sometimes referred to as "admission by silence." The circumstances under which the accusatory statements are made must be not only such as afforded the accused an opportunity to speak but such also as would properly, naturally and reasonably call for some reply. (See 80 A. L. R. 1235, 1236.) There is a wide divergence of judicial opinion as to the effect on admissibility of incriminating statements made in the presence of an accused and not denied by him of the fact that he was under arrest or in custody under a criminal charge at the time the accusation

A   I visited him twice while at the jail.
Q   When was the first visit?
A   The 31st of July, this year [1935]. * * *
Q   When was the second time that you visited him?
A   Two or three days later.
Q   And did you have a conversation with him at that time?
A   Yes, sir.
Q   What was said?
A   What was said?
Q   Yes.
A   At that time, if your Honor pleases, I visited Mr. Corum down there through past friendship. I went down there to talk with him about this case. * * *
Q   All right, go ahead Mr. Murphy and tell us what was said. * * *
A   Well, the incident, Judge,—Mr. Rietow and myself went down there together on this date - - - * * *. We felt that our friend was in a very bad spot. * * *
Q   If you can, give the words, what was said?
A   Arriving at the jail I asked Mr. Corum,—I explained to Mr. Corum, rather, that I was down there through friendship and as a duty I would like to help him if I could; that he was in a very tough spot, and that they had enough evidence against him - - -."
At this point counsel for defendant interposed an objection to the evidence on the ground that it was prejudicial to the defendant. The objection was overruled and an exemption was duly noted by counsel for defendant.
"Q   Go ahead. You told them what about them having enough evidence?
A   To hang him; that I was there to help him, and that I thought that he was crazy, and why didn't he break insanity.

was made. In some jurisdictions it is held that the mere fact of arrest alone is not sufficient to render the testimony admissible. (See 80 A. L. R. 1259, et seq., for text and citation of decision.) But by the Federal and a large number of state courts of last resort it has been held that the fact of arrest on a criminal charge alone is sufficient to render inadmissible as evidence against the accused his failure to deny incriminating or accusatory statements made in his presence and hearing. These decisions hold that it is the common knowledge and belief of men in general that silence while under arrest is most conducive to the welfare of an accused whether he be guilty or innocent; that anything he may say not only may but will be used against him and that such restraint upon an accused destroys the basis for an inference of acquiescence by silence or failure to controvert. Again we refer to 80 A. L. R. at page 1262 where the decisions of the Federal as well as many state

---

Q Why didn't he break insanity?
A Yes.
Q That is the words you used?
A Yes. And that I thought he was crazy, and half the people on the street thought he was crazy, that a jury would think he was crazy, too, and that he would have a better chance to clear up this whole case, and this was scientific evidence that they had against him, and that I would not want to see my friend - - -"
Here defendant's counsel interposed an objection.
"Q Go ahead.
A That was our reason for being there, to help him if we could; poor advice was better than none at all, and I thought I was doing the best I could for our friend who was in trouble.
Q Did you tell him that, or was that your conclusion?
A That was my words, that I told Corum. * * *
Q When you told him to break insanity how did you tell him that?
* * *
A There was no answer, Mr. Kelley, at that time.
Q Wait a minute. When you told him to break insanity how did you tell him that?
A I told him.
Q Did you make any motions?
A Yes.
Q Show us what you did and how you said it.
A I told him to complain of a headache and call in his doctor and to break insanity. I said 'I think you are crazy and I believe a jury will think so.'
Q Now did you say anything else to him?
A Not at that time. Mr. Rietow broke into the conversation.

courts are cited in support of the doctrine, including Colorado, Connecticut, Georgia, Idaho, Indiana, Iowa, Louisiana, Ohio, Oklahoma, Rhode Island, South Carolina, Texas and also the courts of Canada.

"If the accused is held in custody under a criminal charge, mere silence should afford no inference whatever of acquiescence in statements of others made in his presence. He has the undoubted right to keep silence as to the crime with which he is charged, and is not called upon to reply to or contradict such statements. Statements made under such circumstances, it is held by the weight of authority, are not admissible against the prisoner, because they do not even tend to support the hypothesis of acquiescence." 1 R. C. L. 479, 480. And Wharton says the doctrine of acquiescence by silence is subject to the limitation that the accusations "are not evidence against the accused where he remains silent when they are uttered, at a time when he is in custody or under arrest on a criminal charge, as he has the right to keep silence as to the crime, and is not

Q   Yes. What did he say?
A   He said: 'Regarding the powder marks on your hand, Corum,' and Corum spoke up and said 'That is all right, I will explain that when the time comes,' and Mr. Rietow said, 'Wait a minute until I get through talking and then you can talk,' and he went ahead and explained about the powder residue and test they had taken, and Corum sat back in his chair and again he said 'I will explain that when the time comes.'
Q   Was this conversation interrupted?
A   Yes, it was.
Q   Who interrupted it?
A   By the arrival of the defendant's counsel.
Q   And then did you and Mr. Rietow prepare to leave?
A   We were preparing to leave just as the jailor said his counsel was there.
Q   And as you were leaving did Mr. Corum say anything?
A   Yes, sir. At first I said 'All right, Bill, I don't think we will be seeing you again. If you want to get any word to us send it to us and we will come down to see you.'
Q   And what did he say?
A   He said, 'O.K. I will think it over.'
Q   He said 'O.K. I will think it over'?
A   Yes.
Q   And then you left?
A   Yes, then we left."

called upon to reply to it, nor to contradict such statements." 2 Wharton's Crim. Ev. (10th ed.) § 680.

In the case at bar the accused, at the time Murphy talked with him, was not only under indictment charging him with the crime of murder in the first degree but was confined in prison. In *Hauger* v. *United States*, 173 Fed. 54, it is held that the fact that the defendant is under arrest charged with crime renders inadmissible the failure of the accused to deny accusatory statements made in his presence and hearing. The most recent Federal case dealing with the subject which has come to our attention is *McCarthy* v. *United States*, 25 F. (2d) 298. We quote from the decision: "The respondents in these cases were arrested for being in the possession of intoxicating liquor, and for maintaining the place where it was kept for sale. One Close was arrested with them, as a participant in their offences. All three under arrest were taken before the district attorney for examination. An officer who was present testified that at this time, and in the presence of the two respondents, Close had said that the respondents were the ones who carried on this place. Objection was made to this testimony. The court ruled that, as Close's statement was made in the presence of respondents, the officer's recital of

---

At this point counsel for defendant moved to strike the entire statement of the witness and asked that the jury be instructed to disregard it as incompetent, etc. The motion was denied and counsel duly noted an exception.

"Q  * * * What was the object of taking Rietow down there with you?
A  He was,—We were all friends, and had known each other beforehand, and we had talked it over before we went down there.
Q  And you decided he was in need of advice and you went down to give him advice, is that right?
A  Yes, sir. * * *
Q  And I was on the outside, was I not, and sent word in to you by the deputy that I was waiting, and you and Mr. Rietow came out, is that right?
A  Yes, sir. * * *
Q  Now, Mr. Murphy, you have been convicted of a felony, have you not?
A  I don't think that enters into this case, Mr. O'Reilly.
Q  Have you ever been convicted of a felony?
A  Yes."

it could be received. Doubtless there are cases where testimony as to statements made in the presence of a respondent may be intended as introductory to some affirmative admission or confirmatory statement thereupon made by him, and in such case an objection, as soon as the witness is asked what was said in respondent's presence, may be premature, for the question may be leading to a confession by respondent; but here there was no testimony that either respondent said anything, and it seemed to be the theory of the prosecutor and of the court that the silence of the respondents under such circumstances would be considered as tending to show their guilt. We infer from the record that the ruling was intended to be to this effect, and that the jury would have so understood it. This was error. Where accusatory statements are made in the presence of a respondent and not denied, the question whether his silence has any incriminating effect depends upon whether he was under any duty or any natural impulse to speak. Sometimes or often, in the earlier stages of the matter, there may be such a duty or impulse; but, after the arrest and during an official examination, while respondent is in custody, it is common knowledge that he has a right to say nothing. Only under peculiar circumstances can there seem to be any duty then to speak. Lacking such circumstances, to draw a derogatory inference from mere silence is to compel the respondent to testify; and the customary formula of warning should be changed, and the respondent should be told, 'If you say anything, it will be used against you; if you do not say anything, that will be used against you.' See comments of Shaw, C. J., in Com. v. Kenney, 12 Metc. (53 Mass.) 235, 46 Am. Dec. 672; Com. v. Walker, 13 Allen (Mass.) 570; Com. v. McDermott, 123 Mass. 440, 25 Am. Rep. 120; Porter v. Com. (Ky.) 61 S. W. 16, 17 and citations; State v. Weaver, 57 Iowa, 730, 11 N. W. 675. Also comment by Judge Learned Hand in Di Carlo v. United

States (C.C.A. 2) 6 F. (2d) 364, 366. * * * The judgments must be reversed, and the cases remanded for a new trial."

It was upon the authority of the decision in *Territory* v. *Buick,* 27 Haw. 28, that the trial court permitted the evidence of Murphy to go to the jury and subsequently gave prosecution's instruction No. 13 B. In the *Buick* case the accused, while under arrest and in the custody of police officers, was escorted to the hospital where his alleged victim lay conscious but mortally wounded. In the presence of the accused one of the officers asked the injured man the question: "Did this man [indicating the defendant] shoot you?" the reply being, "Yes this man shoot me but he got cap on at that time." To this accusation the accused made no audible reply. It was held by this court that the testimony of the police officer reciting the accusation was competent evidence to go to the jury upon the theory that "the occasion and the circumstances were such that the defendant was afforded an opportunity to speak and Ito's [the deceased's] accusation was such that naturally and ordinarily would have called forth a reply from an innocent person." The court then cited and quoted from the decision of the Federal Supreme Court in *Bram* v. *United States,* 168 U. S. 532, 558, as supporting the doctrine announced. The *Bram* case involved solely the question of the propriety of receiving in evidence an alleged oral confession made by the defendant in the presence of an officer. The controversial rule of "admission by silence" of an accused under arrest was not before the court in the *Bram* case and was not approved nor even referred to in the opinion except incidentally, the court saying: "Indeed, the implication of guilt resulting from silence has been considered by some state courts of last resort, in decided cases, to which we have already made reference, as so cogent that they have held that where a person is accused of guilt, under circumstances which call upon him to make denial, the fact of

his silence is competent evidence as tending to establish guilt. Whilst it must not be considered that by referring to these authorities we approve them," etc.

There is a clear distinction between a free and voluntary oral or written confession of an accused and a case involving the doctrine of "admission by silence." This distinction was apparently overlooked in the *Buick* opinion. An exception to the doctrine rejecting the "admission by silence" rule where the accused is under arrest and charged with crime is recognized by the Federal courts in cases involving the confession of a coconspirator made in the presence of an accused in custody directly implicating the latter in the crime charged. If the criminal act was the result of a conspiracy or the joint act of two or more defendants a confession of one of the defendants made in the presence of and involving his codefendant under such circumstances as would warrant the inference that the latter would naturally have contradicted him if he did not assent to their truth and although he may be in custody at the time the declarations are admissible under the "admission by silence" rule. (See *Sparf and Hansen* v. *United States*, 156 U. S. 51; *Dickerson* v. *United States*, 65 F. [2d] 824.) Under all other circumstances where the accused was in custody under a criminal charge the Federal courts have consistently rejected the doctrine of "admission by silence." (See *Graham* v. *United States*, 15 F. [2d] 740.) But for other reasons, and regardless of whether we approve or reject the doctrine laid down in the *Buick* case, the introduction before the jury of the testimony of Murphy must be held to have been error and clearly prejudicial to the defendant. For even in those jurisdictions where the rule of "admission by silence" of an accused in custody is recognized the statements, to be admissible as evidence, must have been made in the presence of the defendant, incriminating or accusatory in character and the truth of

the facts embodied therein must have been within the knowledge of the accused. If the statements are not inculpatory or if they be such that from lack of knowledge the accused cannot deny them no inference of guilt can flow from the fact that he remains silent. (*Hauger* v. *United States, supra; Vaughan* v. *State,* 127 Pac. 264; *People* v. *Koerner,* 154 N. Y. 355; *People* v. *Hartwell,* 37 Cal. App. 799; *Davis* v. *State,* 37 So. 1018; *People* v. *Page,* 162 N. Y. 272; *McNutt* v. *State,* 163 Ark. 444; *Commonwealth* v. *Kenney,* 46 Am. Dec. 672; *Commonwealth* v. *McDermott,* 123 Mass. 440.)

Murphy at no time accused the defendant of the crime charged or of any other crime. His language addressed to the prisoner was neither incriminating nor accusatory. Given the most liberal construction of which it is susceptible, it amounted to no more than a statement that he believed that the defendant "was in a very tough spot"; that he believed the government was in possession of sufficient evidence to convict the defendant; that the witness thought the defendant was insane and that half the people on the street were of like mind and that a jury would concur in that belief and that in Murphy's opinion the defendant should plead insanity. The accused could not have known what Murphy or some of the people on the street may have thought. Neither could he have been aware of the quantum of evidence in the possession of the government or what effect it might have upon a jury. Murphy's statements were at best mere expressions of his opinion and to the accused they must have appeared wholly conjectural, requiring no response. Had the defendant concurred in all that Murphy said, such concurrence would not have been an admission of guilt nor inconsistent with his claim of innocence. In the conversation between Murphy, Rietow and defendant, the former did most of the talking. At one point when Rietow referred to the powder marks on the accused's hand

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

the latter said: "That is all right, I will explain that when the time comes." Apparently before the defendant had an opportunity to complete his statement Rietow admonished him, "Wait a minute until I get through talking and then you can talk." Rietow then continued to refer to the powder marks, the accused repeating his former statement, and in the midst of the conversation it was abruptly terminated by the arrival of the jailer. As Murphy and Rietow were leaving the prison Murphy said: "All right, Bill, I don't think we will be seeing you again. If you want to get any word to us send it to us and we will come down to see you." The defendant replied: "O. K. I will think it over." The prosecuting attorney concludes that from the last remark of the defendant it is proper to assume that he was responding to Murphy's advice theretofore given to the effect that the defendant should plead insanity. The context does not support such an assumption. Murphy at the conclusion of the interview offered to return to see the defendant and suggested that he be notified should the defendant desire to see him. The rejoinder of the defendant "O. K. I will think it over" was a natural response to Murphy's offer to revisit him. Rietow, although under subpoena by the prosecution, was not called as a witness. In the light of all these circumstances we conclude that the defendant's failure to refute the statements of Murphy and Rietow cannot afford the basis of an inference of guilt.

The evidence of Murphy, therefore, was incompetent and should have been excluded. The trial judge should have sustained the objection interposed by counsel for the defendant and should have granted his subsequent motion to strike. It is impossible to determine to what extent this incompetent and illegal evidence may have influenced the verdict of the jury and for which reason its introduction was highly prejudicial to defendant. As so aptly said in *McCarthy* v. *United States, supra:* "We cannot say that it

was not the element that turned the scales when the jury decided whether to believe the respondents, who later, as witnesses, denied all connection with the supposed offense."

As the evidence in question should have been excluded it was also error to give to the jury prosecution's instruction No. 13 B which is in the following language: "I further instruct you that if you believe beyond a reasonable doubt that certain statements were made to the defendant which incriminated him, and that the defendant failed to controvert, qualify or explain such statements and that he was in a position to do so, and that his conduct or attitude in this respect was voluntary, then you may consider such failure, if any, on the part of the defendant to controvert, qualify or explain such statements in determining whether the defendant admitted the truth of such statements."

The rule is universal that an instruction to a jury cannot be predicated upon assumed facts upon which there is no proof nor upon incompetent and illegal evidence which should have been excluded.

Having reached the conclusion that the testimony of Murphy was wrongfully admitted and that prosecution's instruction No. 13 B was erroneously given, all to the serious prejudice of the defendant, it follows that the ends of justice require a new trial of the cause.

We will now briefly discuss some of the other alleged errors specified in the defendant's assignments. Defendant's assignments of error 5, 15 and 24 involve similar questions, that is to say, the action of the trial court in permitting incompetent evidence against the defendant of a damaging character to go to the jury and subsequently instructing the jury to disregard it. During the trial Detective Rice, a witness for the prosecution, was permitted, over the objection of counsel for the defense, to identify a newspaper published in the State of Tennessee which was found in the bedroom at the time of the discovery of the

deceased's body, and which contained a headline on the first page, reading: "Murder case still a mystery." The article had no reference to the defendant or to the crime with which he is charged. It was merely the usual newspaper account of an unsolved murder said to have been committed in the State of Tennessee. It was admitted in evidence but later on was stricken with an admonition to the jury to dismiss it from their minds. Dr. Larsen, a witness for the government, was, over objection, permitted to testify that in his opinion the deceased was not of a suicidal disposition. Subsequently the jury was instructed to disregard Dr. Larsen's testimony. And similarly, Mabel Slattery, a government witness and a friend of the deceased, in response to a question by the prosecuting attorney, was, over objection by counsel for the defense, permitted to testify that two and a half years prior to the tragedy the deceased had expressed to the witness a fear of firearms. The court later on told the jury to disregard this testimony. It is gravely doubtful whether the subsequent admonitions to disregard the evidence of these several witnesses removed its baneful effect. When illegal testimony has been admitted it is always a serious question as to how far such testimony, though withdrawn in the most explicit and emphatic manner, has detrimentally affected the defendant. In the case at bar the incompetent evidence must have made a strong impression upon the minds of the jury. It is doubtful if that impression was dispelled by the mere instruction to disregard it. It is strongly to be assumed that the poison had already taken effect. "Jurors are but humans, and humans cannot help being influenced more or less in their judgment by impressions once received, try to ignore them as they will." *State v. Allemon*, 86 So. 482. (See also *State v. Hopkins*, 50 Vt. 316; *Montgomery v. Commonwealth*, 30 S. W. 602; *Chism v. State*, 12 So. 852; *Brown v. State*, 100 So. 616.) The ad-

mission by a trial judge of incompetent evidence before a jury followed later by an admonition to disregard the evidence is a practice which should not only be discouraged but condemned. In the case at bar the several rulings, first admitting and then striking from the record the illegal and incompetent evidence, if isolated and considered separately, might not constitute reversible error, yet when taken together they support the strongest conviction that the defendant was seriously prejudiced by the action of the trial court. The prosecuting officer insists that the evidence was competent but he argues that even though the court committed error the defendant, by failing at the times the court withdrew the evidence from the jury to move for a mistrial, lost his right to present the question to this court on review. The strict rule of appellate procedure perhaps sustains this position but we would be extremely hesitant to sustain a conviction carrying the death penalty merely because the defendant's counsel failed to observe a technicality which involved a mere matter of form but nothing of substance.

The action of the trial court in denying defendant's motion for a new trial is made the subject of defendant's assignments of error numbers 38, 39 and 40. For reasons heretofore stated the motion should have been granted and the denial thereof was error.

The remaining assignments of error have been considered and are deemed to be without merit. For the reasons stated the judgment and sentence of the lower court are set aside and a new trial of the cause is hereby ordered.

*W. T. O'Reilly* and *M. K. Ashford* (also on the briefs) for plaintiff in error.

*J. C. Kelley,* Public Prosecutor, and *C. E. Cassidy,* Assistant Public Prosecutor (also on the briefs), for the Territory.

## CONCURRING OPINION OF BANKS, J.

I think the record before us does not require a reconsideration of the law as it is announced in the *Buick* case. There the statement that was admitted in evidence was made by the victim and was unmistakably accusatory. In the case before us it is the view of the chief justice as well as my own that no statement was made to the defendant by Murphy or Rietow accusing him of or charging him with the murder of his wife. Nor did the defendant say anything on that occasion that by any fair inference could be construed as a confession of guilt. This, to my mind, is sufficient reason for the conclusion that it was reversible error to admit Murphy's testimony.

I am also in sympathy with the views of the chief justice regarding the effect of admitting, against the objection of the accused, incompetent and mischievous evidence. The subsequent exclusion of this evidence and the instruction to the jury to disregard it may have cured the error but there is no certainty that its effect upon the minds of the jury did not remain.

I have particularly in mind that portion of the testimony of Dr. Larsen, a physician of long residence in the community and of wide professional experience, in which he was permitted to express to the jury the opinion that Mrs. Corum was not the type of person who would commit suicide. Whether she did commit suicide was one of the important issues in the case. This testimony of Dr. Larsen, coming from the source it did, must have made a deep impression upon the jury and in spite of the fact that it was subsequently excluded by the trial judge and the jury admonished not to consider it, it is extremely doubtful whether its influence upon the jury was removed.

It is my view that under these circumstances the defendant's right to a fair and impartial trial was seriously jeopardized and that in the interests of justice he should

be given another hearing. The failure of his counsel to move for a mistrial upon the exclusion of the evidence which was improperly received should not be construed as a waiver or abandonment of this right. The duty of the court to grant a new trial (in case of a sentence to death) when upon a review of the evidence it appears that the interests of justice require it is imposed by section 3563, R. L. 1935, in the following language: "In case of a sentence to death, the court shall review the evidence to determine if the interests of justice require a new trial, whether the insufficiency of the evidence is assigned as error or not."

I concur in the order of reversal.

### DISSENTING OPINION OF PETERS, J.

In my opinion everything that occurred at the city and county jail in the presence of the defendant upon the occasion of the visit of Murphy and Rietow was properly received in evidence as admissions of the defendant.

"Admissions are competent evidence in the trial of any case where they are pertinent to the issue and where they tend to incriminate the accused and connect him with the crime charged." 2 Wharton's Crim. Ev. (11th ed.) § 645, p. 1081.

An admission may be in the form of a direct statement of the accused (Id. § 645, p. 1081) or it may be implied from the failure of the accused, when a statement is made to him or in his presence, to deny, contradict or object to the same, where from the nature of the statement a denial, contradiction or objection by the accused might be ordinarily and reasonably expected. (Id. § 656 and cases cited under footnote 13, p. 1089.)

The only ground of admissibility of this evidence considered by my brothers is the latter and hence I shall direct my attention to that phase of the question first.

As I understand the majority opinions they accept as controlling the rule of "admission by silence" as enunciated in 2 Wharton's Crim. Ev. (11th ed.) § 656, p. 1089, but in my opinion they have misconceived its meaning and scope and misconstrued the evidence to which it is applicable.

Both opinions proceed upon the theory that the incriminating statement must be directly and openly accusatory in character and made to the accused by one the refusal to answer whom would ordinarily, similarly as in civil cases, operate as an estoppel. The rule admits of no such connotations.

Throughout the opinion of the chief justice the terms "accusatory" and "incriminating" are used interchangeably as though synonymous. Moreover the term "incriminating" is applied as though it meant "accusatory." Obviously an accusatory statement is an incriminating one. But an incriminating statement need not necessarily be accusatory. Nor need the incriminating statement be more than an indirect reference, allusion or implication in respect to any matter or thing material to the proof of the offense charged. The real test is whether the statement is one ordinarily and reasonably calling for denial, contradiction or objection. And this is· so not because the failure to deny, contradict or object to the statement is evidence of its truth but because it indicates a consciousness of guilt and permits an inference of guilt of the crime charged. Silence in the face of inculpatory or incriminating statements where, if innocent, denial, contradiction or objection would be ordinarily and reasonably expected is but a manifestation of a consciousness of guilt similarly as flight, lying, going armed, resisting arrest, traveling under an assumed name or secreting stolen goods. In the experience of mankind inculpatory or incriminating statements provoke denial, contradiction or objection by the innocent.

Professor Wigmore says: "The commission of a crime leaves usually upon the consciousness a moral impression which is characteristic. The innocent man is without it; the guilty man usually has it. Its evidential value has never been doubted. The inference from consciousness of guilt to 'guilty' is always available in evidence. It is a most powerful one, because the only other hypothesis conceivable is the rare one that the person's consciousness is caused by an insane delusion, and not by the actual doing of the act." 1 Wigmore on Evidence § 173, p. 224. "A criminal act leaves usually on the mind a deep trace, in the shape of a consciousness of guilt, and from this consciousness of guilt we may argue to the doing of the deed by the bearer of the trace. * * * As an axe leaves its mark in the speechless tree, so an evil deed leaves its mark in the evil doer's consciousness." Id. § 267, p. 336. (See "Some Observations on the Law of Evidence—Consciousness of Guilt," R. M. Hutchins, D. Slesinger, U. of Pa. L. Rev. 77:725-40.)

As might be expected the greater number of incriminating statements made to or in the presence of an accused are accusatory in form and hence the majority of cases that have found their way to the courts of last resort involve accusatory statements and contain misleading general *dicta* that unless the statements are accusatory they are inadmissible. An examination of the cases cited by Wharton in support of his rule found in note 13 on page 1089 discloses that the incriminating statements made to or in the presence of the accused in order to their admissibility need be nothing more than indirect references, allusions or implications: *State* v. *Cruse,* 112 Kan. 486, 212 Pac. 81, "to the prejudice of an accused"; *Donnelly* v. *State,* 26 N. J. L. 601, 613, "injuriously affect his [defendant's] rights"; *People* v. *Kessler,* 333 Ill. 451, 164 N. E. 840, "that he [defendant] was concerned in its [the

crime's] perpetration." Roscoe's Criminal Evidence (8th ed.) page 89, says: "Besides the proof of direct confessions, the conduct or demeanor of a prisoner on being charged with the crime, or upon *allusions* being made to it, is frequently given in evidence against him." Additional authorities are cited in the margin.[1]

Nor is it necessary that the incriminating statement refer to the ultimate fact. The reference may be to any matter or thing material to the proof of the offense charged: *State* v. *Goodwin, supra,* "relating to the matter at issue"; *Commonwealth* v. *O'Brien,* 179 Mass. 533, 61 N. E. 213, "if found to concern a material matter." See also [2].

The rule of acquiescence by silence finds its application most frequently in the accusations of victims of criminal offenses committed against them and of peace officers such as detectives, prosecuting officers and the like made to or in the presence of the accused. But the application of the rule is not confined to such instances. The incriminating statement may be made by a codefendant or a stranger to the offense or to its detection or prosecution: *Jackson* v. *State, supra,* conversation between witnesses and the de-

---

[1] *Jackson* v. *State,* 213 Ala. 143, 104 So. 220, 221; *State* v. *Belknap,* 39 W. Va. 427, 19 S. E. 507; *State* v. *Goodwin,* 119 Wash. 135, 204 Pac. 769, 770; *Vaughn* v. *State,* 22 Ala. App. 604, 139 So. 833; *McUin* v. *United States,* 17 App. D. C. 323, 331; *State* v. *Walton,* 172 N. C. 931, 90 S. E. 518; *Rawls* v. *State,* 160 Ga. 605, 128 S. E. 747; *Conway* v. *State,* 118 Ind. 482, 21 N. E. 285; *State* v. *Wilson,* 205 N. C. 376, 171 S. E. 338, 339.

[2] *Smith* v. *State,* 158 Ark. 487, 250 S. W. 527, 528; *State* v. *Poynter,* 34 Idaho 504, 205 Pac. 561; *People* v. *Hicketts,* 324 Ill. 170, 155 N. E. 39; *State* v. *Davis,* 133 Kan. 571, 300 Pac. 1114; *Commonwealth* v. *Sliney,* 126 Mass. 49; *State* v. *Plym,* 43 Minn. 385, 45 N. W. 848; *State* v. *Quirk,* 101 Minn. 334, 112 N. W. 409; *State* v. *Samis,* 296 Mo. 471, 246 S. W. 956, 959; *State* v. *Steinkraus,* 244 Mo. 152, 148 S. W. 877, 879; *State* v. *Morris,* 94 N. J. L. 19, 108 Atl. 765; *State* v. *Rosa,* 72 N. J. L. 462, 62 Atl. 695, 697; *State* v. *Willoughby,* 180 N. C. 676, 103 S. E. 903, 904; *State* v. *Riley,* 188 N. C. 72, 123 S. E. 303, 304; *State* v. *Portee,* 200 N. C. 142, 156 S. E. 783, 784; *State* v. *Robinson,* 97 W. Va. 691, 127 S. E. 46, 47; *State* v. *Walton, supra; State* v. *Guffey,* 39 S. D. 84, 163 N. W. 679, 680; *Hardy* v. *State,* 150 Wis. 176, 136 N. W. 638; *McCormick* v. *State,* 181 Wis. 261, 194 N. W. 347, 350.

fendant; *Vaughn* v. *State, supra,* the statement of one defendant incriminating another; *Ford* v. *State,* 34 Ark. 649, 654, at the magistrate's trial H [defendant] said to appellant and J [another defendant]: "Boys, I am out of this, and, if P [another defendant] don't turn state's evidence, we are all right"; *Conway* v. *State, supra,* conversation in presence of the defendant in which the witness was seeking to obtain information that might enable the accused to escape; *State* v. *Davis, supra; Commonwealth* v. *Galavan,* 9 Allen (Mass.) 271, 273, statements by a wife in the presence of her husband; *Commonwealth* v. *Sliney, supra,* conversation between inmate and prospective customer on trial for keeping a house of prostitution; *Smith* v. *State,* 52 Tex. Cr. 344, 106 S. W. 1161, request by a fraternity brother of the accused to deny the charge if not guilty and his answer, "I want it investigated"; *Taylor* v. *State,* 135 Ga. 622, 70 S. E. 237, effort to suppress evidence; *Wasserleben* v. *State,* 184 Ala. 2, 63 So. 520, effort to conceal a crime; *Morehead* v. *Commonwealth,* 194 Ky. 592, 240 S. W. 93, forestalling an indictment.

Obviously every case depends upon its own individual facts. But the scope of the rule is indicated by the refusal by the majority of the authorities to be confined to any set rule and the adoption of the more general test of whether "from the nature of the inquiries, if innocent, reply would naturally be made." Greenleaf says: "Admissions may also be implied from the *acquiescence* of the party. But acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. * * * The circumstances, too, must be * * * such also as would properly and naturally call for some action or reply, from men similarly situated." 1 Greenleaf on Evidence (14th ed.) § 197, p. 257. Professor Wigmore approaches the subject from the same standpoint as Greenleaf: "This sort of evidence is admitted because

there is a certain degree of uniformity in its meaning, but the variations from uniformity are so frequent, and depend so much upon personal character and local circumstances that no fixed rules should be laid down." 1 Wigmore, *supra*, § 273, p. 348. The following cases reflect the majority rule: *Vaughn* v. *State, supra:* "Where a statement is of such character as would naturally call for a reply"; *State* v. *Cruse, supra:* Statements "to the prejudice of an accused made in his presence and which he tolerates without resentment, explanation or denial, are ordinarily admissible as some evidence of his consciousness of guilt"; *State* v. *Belknap, supra:* "That it naturally and reasonably called for some reply"; *State* v. *Goodwin, supra:* "Relating to the matter at issue, which would naturally call for reply, if the defendant did not desire to acquiesce in them." The United States Supreme Court, in the case of *Bram* v. *United States,* 168 U. S. 532, 559, summarizes the decisions of the state courts as follows: "In some of the States it has been held that where questions are propounded to a prisoner by one having a right to ask them, and he remains silent, where from the nature of the inquiries, if innocent, reply would naturally be made, the fact of such silence may be weighed by the jury."

A great many of the authorities say that whether or not the accused, from the nature of the statement, was called upon to deny, contradict or object to the statement is a question of fact for the jury inferring that the question of consciousness of guilt is solely a question for the jury. Other authorities say that their admission is within the discretion of the trial judge. I concede that there is the preliminary question for the court to decide in the first instance as a matter of law whether the evidence is admissible. But from an examination of the authorities cited in the note referred to in Wharton it would seem that if the alleged statement made to or in the presence of the accused

and his action and conduct in connection therewith indicate the least consciousness of guilt the evidence is admissible. Wigmore summarizes the situation as follows: "The general principle, as applied to the conduct of one accused of crime, finds illustration in a great variety of instances. In those which have led to judicial rulings, there has seldom resulted an exclusion, because usually none but conduct having at least *plausibly a guilty significance* [italics supplied] is commonly offered." 1 Wigmore, *supra,* § 273, p. 348.

Hence it may be said in conclusion that the authorities support the rule that where any reference, allusion or implication, direct or indirect, in respect to any matter or thing material to the proof of an offense charged, is made by anyone to or in the presence of a person accused or suspected of the commission of such offense, where, from the nature of such reference, allusion or implication, if innocent, reply would naturally be made, the failure to deny, contradict, object to or explain such reference, allusion or implication is material, relevant and competent evidence of a consciousness of guilt.

The majority are agreed that the language of the witness Murphy to the accused was neither incriminating nor accusatory. The evidence of Murphy quoted in the margin is its own refutation.

As I construe the evidence, Murphy and Rietow advised the accused to interpose the defense of insanity and to immediately proceed upon a false and deceptive course of conduct calculated to give credence to that defense ("break insanity," "I told him to complain of a headache and call in his doctor and to break insanity") ; in other words to malinger; that the statements that the accused was in a difficult and dangerous position ("very tough spot") and that the prosecution was in possession of sufficient evidence to convict ("that they had enough evidence against him—

to hang him") were preliminary to and assigned by them as reasons for the advice which followed; and Murphy's statement that he thought the accused was crazy and that half the people on the street thought he was crazy was made by way of intimation of the evidence available and which in the event the accused interposed a defense of insanity, Murphy and Rietow, consistently with their offer to assist, could secure.

To advise a person accused of the crime of murder to interpose the defense of insanity and to immediately proceed upon a false and deceptive course of conduct calculated to give credence to such defense and as reasons for such advice to state that the accused is in a very difficult and dangerous position; that the government is in possession of evidence sufficient to convict and that the defense advised appears to be the only successful means of escape, while not "accusatory" is certainly "incriminating." Nor are the reasons assigned for the advice "mere expressions of opinions" which to the accused would appear "wholly conjectural requiring no response."

Murphy and Rietow were friends of the accused. They had mutually previously discussed the evidence against him, and they appeared fully conversant with its details as instanced by the reference by Murphy to "scientific evidence" and the particularization by Rietow of the discovery of powder residue on the right hand of the accused within a few hours of the tragedy, evidence of which later upon the trial was given by the witness Dr. McVeagh, the expert in charge of the bureau of criminal research. They mutually concluded that their friend was in a "tough spot" a "very tough spot" and feeling in duty bound to help him extricate himself from the difficult and dangerous position in which he was, called on the accused for that purpose and unfolded to him the scheme which they had devised for his escape from what they thought was certain convic-

tion. Viewed from the ordinary experience of mankind what reaction might one ordinarily and reasonably expect from an accused under those circumstances when thus approached? Silence? I think not. Silence to the suggestions of strangers or intermeddlers might be explained. But to friends it is inexplicable. To friends the accused, if innocent, would have, in my opinion, expressed doubt of the existence of such evidence; proclaimed its falsity if it did exist; protested innocence and spurned the advice of a defense that in effect admitted the commission of the criminal act but denied legal responsibility therefor by reason of insanity.

To say that "had the defendant concurred in all that Murphy said, such concurrence would not have been an admission of guilt nor inconsistent with his claim of innocence" is beside the point. If the accused, instead of excluding, had admitted his friends into his confidence an entirely different conversation would have taken place accordingly as the defendant was innocent or guilty. If innocent he would have replied as in my opinion an innocent man ordinarily and reasonably might be expected to reply. But he didn't. And we are therefore alone concerned with the silence of the accused and the application of the rule of "admission by silence."

Reliance is placed upon the reply of the accused to Rietow's reference to the incriminating presence of powder residue. The interruption by the accused of Rietow's statement and the repetition at its conclusion, "That is all right, I will explain that when the time comes," in my opinion is tantamount to silence. Rietow's statement called for an explanation. The presence of powder residue on the right hand of the accused was a fact material to the proof of the crime charged. Its importance and incriminating effect had apparently impressed both Murphy and Rietow and was referred to by both as one of the pieces of evidence in

the possession of the prosecution calculated to convict. And yet when confronted with it the defendant hides behind an evasive, negative statement that means nothing.

But the *bon mot* of the exculpatory explanation of the conduct of the accused is the construction placed upon his parting reply: "O.K. I will think it over." In the conversation just concluded the accused had been told by his friends that the prosecution had in its possession sufficient evidence to convict. To this statement he was silent. One, particularized and referred to a particular piece of damaging evidence. The accused evades. The suggestion is made of the interposition of the defense of insanity. This suggestion is met by silence. The friends conclude that their visit has been in vain; that any further efforts by them on behalf of the accused are useless and under the circumstances, in parting say: "All right, Bill, I don't think we will be seeing you again. If you want to get any word to us send it to us and we will come down to see you," to which the defendant replied as already quoted. This reply is construed as a "natural response to Murphy's offer to revisit." "It" as contained in the reply of the defendant in my opinion referred to the suggestion of the defense of insanity in the event of the adoption of which by the accused, Murphy's and Rietow's return would become necessary in view of their offer of assistance and the indefiniteness of their first reference to the available evidence of insanity. But assuming that the word "it" referred to an offer to "revisit" it amounts to the same thing. The offer to revisit was conditional upon the accused's wanting to see Murphy and Rietow again and the accused would want to see them again only if he adopted their advice and desired to avail himself of their assistance in securing the evidence referred to. However, reasonable men may differ as to the import of the language employed, and I accord to the majority the same reasonable consideration of this

evidence as I assert for myself, we have a situation peculiarly within the province of the jury to decide. The majority believe that this language is capable of one construction. I believe it is capable of another. Certainly this is a case, if there ever was one, where the submission of the construction of the language properly went to the jury.

There was ample proof of the *corpus delicti* and the conversation objected to was properly admitted in evidence under the rule of "admission by silence."

But the entire conversation was properly admitted in evidence upon another ground. As I construe the parting reply of the defendant to Murphy and Rietow, "O.K. I will think it over," it was a direct admission against interest and was admissible as substantive evidence of the crime charged. This portion of the conversation being admissible in evidence the entire conversation was admissible to explain its character and import. The whole of a conversation containing an admission should be received in evidence. (*Bennett* v. *State,* 96 Fla. 237, 118 So. 18.)

Any statement made by a defendant though not admitting the commission of the crime charged as against his interest is competent against him if it throws any light on the issue being tried and elucidates the subject matter of the trial. (2 Wharton's Crim. Ev. § 647, p. 1083.) Similarly as in the case of "admission by silence" "the admission may not of itself be definitely connected with the * * * occurrence upon which the charge of crime is based. The general rule applicable in such a case, unless the admission is so remote and vague as to be of no probative value, is that the statement is competent; it is for the jury to say whether the statement was or was not an admission referring to the crime charged." Id. § 647, p. 1084. "An admission which tends to prove an element of the crime charged and the connection of the defendant with such crime is competent evidence against the accused." Id. § 649, p. 1085.

Hence in my opinion all that occurred at the visit at the county jail was properly admitted in evidence as admissions, both under the rule of "admission by silence" and the rule of "admissions against interest."

One of the reasons assigned by the chief justice in his opinion for the inadmissibility of this evidence was the fact that the defendant was under indictment for the offense to which the conversation of the defendant and Murphy referred and in default of bond was confined in jail, awaiting trial. This ground of alleged inadmissibility was not advanced by the defendant upon the trial either by his objections to the questions propounded which are the subject of assignment No. 21, nor by his motion to strike which is the subject of assignment No. 22. Nor did the defendant raise the point in his brief. This court is not at liberty to consider errors not assigned. The provision of section 3563, R. L. 1935, requiring the court in cases of this kind to "review the evidence to determine if the interests of justice require a new trial, whether the insufficiency of the evidence is assigned as error or not" refers and is confined solely to the question of the sufficiency of the evidence to sustain the verdict. (17 C. J., T. Crim. L., § 3593, p. 262, and cases cited under note 75 [a] especially. *People* v. *Taylor,* 138 N. Y. 398, 34 N. E. 275, 278; *People* v. *Kerrigan,* 147 N. Y. 210, 41 N. E. 494, 495; *People* v. *Rodawald,* 177 N. Y. 408, 70 N. E. 1; *People* v. *Becker,* 215 N. Y. 126, 109 N. E. 127.) Moreover, if, as the chief justice holds, the statements of Murphy and Rietow were not accusatory and hence inadmissible whether the defendant was under legal restraint or not becomes immaterial. And the reference to and criticism of the *Buick* case is a mere gratuity. Moreover the legal restraint of the defendant was immaterial under the facts. At the time of the conversation between the witness Murphy and the defendant the latter was not

in the custody of an officer. No one in authority or responsible for his restraint was present and he was discussing his case with Murphy and Rietow in what he obviously supposed to be absolute privacy.

The majority are further agreed that despite its subsequent exclusion under proper instructions by the court, the newspaper published in Tennessee bearing the headline "Murder case still a mystery," the conclusion of Dr. Larsen that in his opinion the deceased was not of a suicidal disposition and the evidence of the witness Slattery that the deceased once expressed to the witness a fear of firearms, must have made such a strong and lasting impression upon the minds of the jurors that it must have been in their minds and despite the instructions of the court to disregard it, considered by them when deliberating upon their verdict.

The trial consumed 17 days, 57 witnesses were examined, the charge of the court includes 37 instructions. The record discloses meticulous observance of the rights of the accused. The care exercised by the learned trial judge is apparent when of the 42 assignments of error alleged those not considered by the majority, in their opinion, were deemed by them to be without merit. The law recognizes the fallibility of trial judges however learned and able and the liability of mistake occurring in the stress of trial and realized by the presiding judge only upon mature reflection. And to avoid the entry of a mistrial and resuming the trial anew accords to the trial judge the right of correcting the mistake and in the case of the admission of improper evidence of striking it out and instructing the jury to disregard the same. "It would be a serious misfortune if, when reflection perceives a mistake, it could not be corrected by 'striking out,' with proper instructions to the jury. This the law permits." *Looker* v. *United States*, 240

Fed. 932, 935. (See also *Pennsylvania Co.* v. *Roy,* 102 U. S. 451.) "The trial of a case is not to be suspended, the jury discharged, a new one summoned, and the evidence retaken, when an error in the admission of testimony can be corrected by its withdrawal with proper instructions from the court to disregard it." *Hopt* v. *Utah,* 120 U. S. 430, 438.

The majority assume that all this evidence was inadmissible. The newspaper article was never read in evidence and hence was never before the jury. Whether admissible or inadmissible is therefore immaterial. I am not satisfied that the evidence of either of the witnesses Larsen or Slattery was inadmissible but it certainly was not prejudicial, it being, as I shall hereafter point out, merely cumulative. But assuming that the evidence was improperly admitted its character and weight was such, and the other evidence of which it was corroborative so overwhelming, that it could not have in itself so affected the jury that one may say as a matter of law that it was impossible for the jury to heed the admonition of the court to disregard it. "It is only when evidence unlawfully admitted is of such apparent weight, and so prejudicial in effect, that the judicial warning against it seems light and unavailing by comparison, that the error remains uncured." *Looker* v. *United States, supra.* (See *Throckmorton* v. *Holt,* 180 U. S. 552; *Armour & Co.* v. *Kollmeyer,* 161 Fed. 78.) "It is true, in some instances, there may be such strong impressions made upon the minds of the jury by illegal and improper testimony, that its subsequent withdrawal will not remove the effect caused by its admission; and in that case the original objection may avail on appeal or writ of error. But such instances are exceptional." *Hopt* v. *Utah, supra,* 438. The article in the newspaper bearing the headline quoted was, as heretofore stated, never read in the presence of the jury. Under the circumstances the heading alone could have had no greater effect upon the jury than any similar headline

appearing in any of the local papers which the jury might have seen during the course of the trial. The prosecution promised to connect the newspaper up and upon its failure to do so admitted such failure and agreed that it be stricken and the jury instructed to disregard it. The evidence of Dr. Larsen though conclusionary in form was preceded by evidence of the same witness and other witnesses to the effect that the deceased was of a uniformly happy and cheerful disposition, intensely interested in her work as a nurse and looking forward to future professional and financial improvement. Hence this evidence, although in the form of an opinion, was merely corroborative of other evidence to the same effect. The evidence of the deceased's fear of firearms was no doubt offered by the prosecution to rebut the defense that the fatal wound was self-inflicted. But the evidence in support of the *corpus delicti* was so clear and convincing that this morsel of evidence could not have conceivably played any part in the jury's deliberation.

In my opinion the record is free from error and the interests of justice do not require a new trial.